UNITED STATES of America,
Plaintiff–Appellee,

v.

Javier ROBLES–PANTOJA,
Defendant–Appellant.

No. 88–5558
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

Oct. 26, 1989.

---

Javier Robles–Pantoja, El Reno, Okl., pro se.

LeRoy Morgan Jahn, Asst. U.S. Atty., Helen M. Eversberg, U.S. Atty., Chris Gober, Asst. U.S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before POLITZ, GARWOOD and JOLLY, Circuit Judges.

GARWOOD, Circuit Judge.

Defendant-appellant Javier Robles–Pantoja (Robles) appeals his conviction, following a jury trial, of one count of conspiracy to distribute cocaine in violation of 21 U.S.C. § 846 (count one), and one count of distribution of cocaine in violation of 21 U.S.C. § 841(a)(1) (count two). Robles challenges the sufficiency of the evidence to support his conviction on each count, alleges prosecutorial misconduct, and raises several specific challenges to his sentence. We affirm.

### Facts and Proceedings Below

Robles was convicted of a conspiracy to sell cocaine to Rudolf A. Gonzalez (Agent Gonzalez), who unbeknownst to the conspirators was an undercover agent with the Drug Enforcement Administration (DEA). The government's evidence indicated that with the assistance of Cesar Fuentes–Castillo (Castillo), a government informant, Agent Gonzalez had agreed with Miguel Franco (Franco) to purchase ten kilograms of cocaine. Franco's intended supplier, however, proved unable to provide the promised quantity. Franco's efforts to find a replacement source led him to Salvador Soto (Soto), who introduced him to a man known as "El Gordo," who ultimately arranged a meeting between Franco and Robles in a Forth Worth hotel room on February 19, 1987.

Apparently to demonstrate his seriousness during that first meeting with Robles, Franco called Agent Gonzalez from Robles' hotel room and confirmed a purchase amount of ten kilograms while Robles listened in on the call. Afterwards, Robles indicated that he might be able to supply that quantity. Robles then called Francisco Hernandez–Gonzalez (Hernandez–Gonzalez), who joined the conspirators at the hotel. To ensure secrecy, Robles, Franco, and Hernandez–Gonzalez all met in the bathroom of the hotel to negotiate the details of the deal.

When they reached an agreement, Hernandez–Gonzalez left the hotel to make arrangements. About six hours later he returned and told Franco that the arrangements had been made. The conspirators agreed to meet in San Antonio, and Franco gave Robles the telephone number of the hotel where Agent Gonzalez had said he could be reached. That night, Robles, Hernandez–Gonzalez, Franco, and Soto drove to San Antonio.

Franco and Soto arrived the next morning at about five o'clock. They met with the informant Castillo at his hotel. After breakfast, Franco and Castillo met with Agent Gonzalez and a second undercover DEA agent working with him, Robert Hernandez (Agent Hernandez). Franco told the undercover agents that he had arranged the transaction with Robles and that the sale would be made in two five-kilogram installments. Afterwards, Castillo and Franco returned to Castillo's hotel room to wait for Robles' call.

That call finally came at about half past noon. Robles assured Franco that the ten kilograms of cocaine was in San Antonio at Robles' hotel. Franco went to Robles' hotel, where Franco confirmed that the co-

caine would be delivered to the purchasers in two five-kilogram installments. Franco then took a sample of cocaine from Robles to show to Agents Gonzalez and Hernandez.

Franco left Robles' hotel and returned to meet with the undercover DEA agents. He showed them the cocaine sample, and they showed him a large quantity of "flash money," to demonstrate their willingness and ability to complete the deal. Franco then called Robles to verify that he had seen the money. Robles told Franco to bring the purchasers over to Robles' hotel with the cash to consummate the first purchase.

The DEA agents had "serialized," or recorded the serial numbers of $36,000 of the cash, which was all they were authorized to release to the targets. At the last minute, Agent Gonzalez told Franco he wanted to purchase just one kilogram in the first transaction, so he could verify its purity. After some hesitation, Franco agreed to this, and both he and the agents proceeded to Robles' hotel with $32,000 of the serialized cash, the remaining $4,000 of which was to be paid to Franco for finding the suppliers.

When they arrived at the hotel, Franco called Robles from a pay phone outside the lobby to tell him that they had arrived and that the initial purchase would be for just one kilogram. Robles agreed. Franco and Agent Gonzalez then went to Robles' room. In the room at the time were Robles, Gonzalez–Hernandez, and two other men, Natividad Moya (Moya) and Ricardo Gonzalez. Robles hid his hand underneath a pillow and Ricardo Gonzalez hid his in his coat, possibly indicating that both were concealing weapons. Agent Gonzalez presented the $32,000 in cash, which Robles and Moya counted at Gonzalez–Hernandez's instruction. Finally, Gonzalez–Hernandez and Ricardo Gonzalez left the room and returned with a package of what the government's forensic chemist testified was 996 grams of 97% pure cocaine. After some further discussion, the exchange was made and the parties agreed to meet again in an hour to complete the sale of the remaining nine kilograms. Franco and the DEA agents left Robles' hotel.

Shortly afterwards, Robles called the hotel room where Soto and the informant Castillo were waiting for Franco's return. Robles told Soto that something was wrong, that the antenna on Agent Gonzalez's van made him think they were narcotics officers, that the rest of the deal was off, and that he and the other suppliers were taking the cocaine and leaving. While Soto was out of the room, Castillo called Agent Hernandez and warned him that the deal had gone sour. At that time, the agents terminated the investigation and arrested the participants. When Robles was arrested, no drugs or weapons were found on his person, but he did have $2,000 of the serialized cash in his possession.

Robles was indicted, together with five of the other participants in this transaction, for one count of conspiracy to distribute cocaine and one count of distribution of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846. He was tried before a jury in a joint trial with Soto and Gonzalez–Hernandez in February 1988.[1] At the close of the government's case, Robles moved for acquittal. This motion was denied, and he failed to renew it at the close of all the evidence. The jury convicted Robles on both counts, and the district court sentenced him to ten years on the conspiracy count and ten years on the distribution count, to run consecutively. A four-year special parole term was imposed to follow the distribution count confinement.

Soto and Robles appealed together to challenge the sufficiency of the evidence to sustain their convictions. Robles subsequently moved to have his counsel discharged and to proceed *pro se* in a separate appeal. We granted the motion and severed the appeals. We affirmed Soto's conviction and sentence in a recent unpublished opinion, *United States v. Soto*, 874 F.2d 813 (5th Cir.1989), and now we consider Robles' sufficiency challenge, as well as

---

1. In the meantime, Franco had chosen to plead guilty and testify as a government witness, while Moya and Ricardo Gonzalez had absconded while released on bail and remain at large.

four additional issues he raises in his *pro se* brief to this Court.

### Discussion

### I. The Sufficiency of the Evidence

 Robles appeals the sufficiency of the government's evidence to sustain the jury's decision to convict him of conspiracy to distribute cocaine. He contends that the government "never presented any evidence that the Appellant was indeed a part of the alleged conspiracy." We find otherwise.

"The usual standard applied when insufficiency of evidence to support a conviction is raised is whether, viewing the evidence presented and all inferences reasonably drawn therefrom in the light most favorable to the government, any rational trier of fact properly could have found each element of the crime beyond a reasonable doubt." *E.g., United States v. Ruiz,* 860 F.2d 615, 617 (5th Cir.1988). However, when the defendant moves for judgment of acquittal at the close of the government's case in chief, and defense evidence is thereafter presented but the defendant fails to renew the motion at the conclusion of all the evidence, he waives objection to the denial of his earlier motion. *Id.* Under those circumstances, appellate review of a claim of insufficiency of evidence will be "limited to the determination of 'whether there was a manifest miscarriage of justice.' Such a miscarriage would exist only if the record is 'devoid of evidence pointing to guilt.'" *Id.* (quoting *United States v. Ivory,* 468 F.2d 613, 614 (5th Cir.1972)). The record in this case is not "devoid of evidence pointing to guilt." In any event, the evidence here is more than sufficient to have sustained the conviction even if Robles had made a timely motion for acquittal at the close of all the evidence.

 To sustain the conspiracy conviction, the government must establish that a conspiracy to unlawfully distribute cocaine existed, that Robles knew of the conspiracy, and that he intentionally joined and participated in it. *E.g., United States v. Prieto–Tejas,* 779 F.2d 1098, 1102 (5th Cir. 1986). The jury may infer a conspiracy agreement from circumstantial evidence, *e.g., United States v. Williams–Hendricks,* 805 F.2d 496, 502 (5th Cir.1986), and may rely upon presence and association, along with other evidence, in finding that a conspiracy existed. *E.g., United States v. Magee,* 821 F.2d 234, 239 (5th Cir.1987).

Robles' argument that the government did not produce any evidence of his participation in a conspiracy is predicated on the assumption that the testimony of Franco was merely allegation, as opposed to "factual evidence." This contention is frivolous. A rational jury certainly could have concluded from Franco's testimony that Robles had played a significant role in arranging the cocaine deal. Franco testified that Robles was his primary contact with the cocaine suppliers, that he was involved in the original negotiation of the purchase, that he called to contact Franco and others upon the suppliers' arrival in San Antonio, and that he answered the phone and told Franco and Agent Gonzalez to come up to the hotel room for the final exchange.

Moreover, Franco's testimony is corroborated in large part by the remainder of the government's case. Agent Gonzalez testified that Robles was present in the hotel room throughout the sale itself and helped to count the money for the cocaine. The government's informant, Castillo, testified that it was Robles who began to suspect that the purchasers were narcotics officers and called Soto and Castillo to tell them the remainder of the deal was off. And finally, when he was arrested, Robles had on his person approximately $2,000 of the serialized cash exchanged for the cocaine.

Robles' challenge to the sufficiency of the evidence boils down to a claim that the government's witnesses lacked credibility. Absent virtual physical impossibility or similar considerations, none of which are even remotely close to being present here, that decision lies within the sole province of the jury. *E.g., United States v. Hernandez–Palacios,* 838 F.2d 1346, 1350 (5th Cir. 1988). The jury was aware of Franco's plea agreement and that he agreed to testify for the government with the hope that he might receive more lenient treatment.

They were aware that Castillo was a government informant who admitted to using cocaine and lying to various participants in the conspiracy. Nonetheless, the jury decided to believe their testimony and convict Robles. We will not now reexamine that decision.

■ We also reject Robles' contention that he cannot be convicted of distribution on an aiding and abetting theory since the indictment charged him only as a principal. The jury was properly instructed on aiding and abetting in connection with the distribution count, and no objection was made to that aspect of the charge. While we agree that, as a general rule, jury instructions may not amend the indictment, we have held that one who has been indicted as a principal may, on proper instructions, be convicted on evidence showing only that he aided and abetted the commission of the offense. *United States v. Oquendo*, 505 F.2d 1307, 1310 n. 1 (5th Cir.1975); *United States v. Gordon*, 812 F.2d 965, 969 (5th Cir.1987). The evidence does so in the present case. *See United States v. Graham*, 858 F.2d 986, 991 (5th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1140, 103 L.Ed.2d 201 (1989).

## II. Prosecutorial Misconduct

■ Next, we consider Robles' claim of prosecutorial misconduct. Robles argues that two portions of the prosecutor's closing argument constituted plain error, acknowledging that this is the standard he must meet because his counsel did not object to either of the two passages about which he now complains. Fed.R.Crim.P. 52(b); *United States v. Davis*, 831 F.2d 63, 66 (5th Cir.1987). Robles contends that the prosecutor improperly vouched for the credibility of Agent Gonzalez and Agent Hernandez in the following two passages:

"[Mr. Gober:] I suggest for you to believe what Mr. Soto said means that for some reason Special Agent Gonzalez and Special Agent Hernandez are trying to put a totally innocent man on the spot. Mr. Gonzalez sat through this trial, he knows what the evidence is.

"Federal agents and police officers should be viewed as any other witness. You should look at their motive for testifying. What's this guy going to get if Mr. Soto gets convicted? Is he going to get a raise? Is he going to get a transfer to Hawaii? I mean, what's in it for him? Is he going to make any more money? What is it to a man who's been in law enforcement for fourteen years with the Federal Government's Drug Enforcement Administration? What's it to him? What's one more guy. It's not like they have to go out and invent drug dealers. Lord knows, there's enough of them out there.

" . . . .

"[Mr. Gober:] I suggest something else here, while we're on that topic. You know at the end of this trial what's going to happen. You're going to go someplace and I'm going to go another place. Everybody's going to go someplace, but I'll tell you where Special Agent Gonzalez is going to, and I'll tell you where Special Agent Hernandez is going to go.

"The Clerk: Five minutes.

"Mr. Gober: Thank you. They're going to go back in some other motel room in San Antonio—

"Mr. Brown [counsel for a co-defendant]: —I'm going to object to this whole argument because there's nothing in the record about it.

"The Court: Overrule the objection.

"Mr. Gober: They're going to go back in another hotel room, and they're going to try to gather evidence to bring before another jury to stop drug trafficking because that's their job and they are professional people. That's what they do, and I suggest that you keep that in mind about why they testify in this case, as to what is it that advantages them by, if you believe the Defense, by constructing a bunch of false evidence to put these folks on the spot.

"If they wanted to construct false evidence, they could have done a tremendous job of putting drugs into people's hands."

Robles also argues that Agent Gonzalez's presence at the prosecutor's table throughout the trial had a cumulative effect upon the trial proceedings when viewed with the alleged prosecutorial misconduct.

Robles, not having objected below, must show that the prosecutor's statements amounted to plain error, that is, error so great that it could not be cured at trial. *Davis*, 831 F.2d at 66. "[T]he error 'must be obvious, substantial, and so basic and prejudicial that the resulting trial lacks the fundamental elements of justice.' " *Id.* (quoting *United States v. Birdsell*, 775 F.2d 645, 653 (5th Cir.1985), *cert. denied*, 476 U.S. 1119, 106 S.Ct. 1979, 90 L.Ed.2d 662 (1986)). "[T]he plain error exception to the contemporaneous objection rule is to be 'used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.' " *Id.* (quoting *United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985)). Like the defendant in *Davis*, Robles relies primarily on *United States v. Garza*, 608 F.2d 659 (5th Cir.1979), to support his argument that the prosecutor's remarks rose to this level.[2] In *Garza*, the prosecutor personally vouched for the honesty and motives of his witness on several occasions,[3] and, more significantly, suggested that he personally would not have brought the prosecution against the defendant if *he* had not known that the defendant was guilty.[4] The aggregate effect of this misconduct, the Court held, rose to plain error and justified granting Garza a new trial.

In the present case, the prosecutor's remarks are of a completely different character. The prosecutor here did not express any purely personal opinion about the credibility of his witnesses, and he certainly did

not intimate that he had evidence of the defendant's guilt other than the evidence in the record. All the prosecutor did was urge the jury to assess the motives and bias of federal agents and police officers in the same way they would assess the motives and bias of *any* witness. Based on facts in the record, and the kind of common sense and knowledge of the natural tendencies and inclinations of human beings that juries are properly allowed to consider, *see United States v. Henry*, 849 F.2d 1534, 1537 (5th Cir.1988), he argued that the DEA agents had less reason to lie than did the defendants. That was not an impermissible bolstering, and, if error at all (which it likely was not), it certainly did not rise to the level of plain error. *See United States v. Davis*, 831 F.2d at 66–67. This is particularly true in the present case, since the most damaging testimony against Robles came not from Agent Gonzalez, but from the co-conspirator Franco (and, to a lesser extent, informant Castillo). None of the allegedly improper statements bolstered Franco's testimony (or that of Castillo) in any way.

Finally, we reject Robles' argument that allowing Agent Gonzalez both to testify and to sit at the prosecutor's table during the trial—which was not objected to below—constituted plain error. Robles relies primarily on *United States v. Anagnos*, No. 87–1690 (1st Cir. March 2, 1988), to support this claim. As Robles concedes, the First Circuit amended that opinion before publication, significantly retracting much of the language on which Robles relies. *See United States v. Anagnos*, 853 F.2d 1, 4 (1st Cir.1988). In any case, we have already decided in this Circuit that Rule 615 of the Federal Rules of Evidence

---

**2.** As Robles points out, the DEA investigating agent in *Garza* was Rudy Gonzalez, the same agent involved in the present case. While this might be an interesting coincidence, it is totally irrelevant to the issue on appeal, since the alleged misconduct in both *Garza* and the present case was that of the prosecuting attorney, a different individual in each instance, not Agent Gonzalez.

**3.** For example, at one point the prosecutor in *Garza* insisted: *"I think* their motives are as

pure as the driven snow. Their motives are to get out and make this world a better place to live in." *Id.* at 662 (emphasis added).

**4.** The prosecutor stated: "And, ladies and gentlemen, if I thought that I had ever framed an innocent man and sent him to the penitentiary, I would quit. Now, I resent the innuendoes that I would stand up here and try to send an innocent man to the penitentiary ... because it's simply not true...." *Id.*

allows the investigative officer in a case to be the government's designated representative to assist the prosecutor at trial, notwithstanding that this officer will also testify at trial as a government witness. *In re United States*, 584 F.2d 666, 667 (5th Cir.1978). Indeed, *Anagnos* recognizes that this is permissible. 853 F.2d at 4. There was no error here. Even if there had been, it certainly would not have been "plain" error.

### III. Imposition of a Prison Term Without Parole

■ Robles also complains that the district court erred when it imposed a sentence without the possibility of parole on count two, the substantive distribution count. We conclude that Robles has incorrectly construed the statutory law applicable to his sentence.

The offenses of which Robles was convicted occurred in February 1987. At that time, 18 U.S.C. § 4205(a) [5] provided that any prisoner serving a definite imprisonment term of more than one year would be eligible for parole after serving one-third of his sentence. *See* Parole Commission & Reorganization Act, Pub.L. No. 94–233, § 2, 90 Stat. 219, 222–23 (1976). Section 4205(h), however, provided that "[n]othing in this chapter shall be construed to provide that any prisoner shall be eligible for release on parole if such prisoner is ineligible for such release under any other provision of law." *Id.*

Robles was convicted of distribution of cocaine under 21 U.S.C. § 841(a). The punishment for that crime is established in 21 U.S.C. § 841(b). On October 27, 1986, prior to the time that Robles committed this offense, section 841(b) was largely rewritten by the Anti–Drug Abuse Act of 1986, Pub.L. No. 99–570, § 1002, 100 Stat. 3207, 3207–2 to –4. One of the changes was the addition to section 841(b)(1)(B) of the proviso that "[n]o person sentenced under this subparagraph shall be eligible for parole during the term of imprisonment imposed therein." *Id.*, 100 Stat. at 3207–4. Similar provision was made in section 841(b)(1)(A) and (C). *Id.*, 100 Stat. at 3207–3, –4. In other words, the amended section 841(b) created an explicit exception to the general 4205(a) rule allowing parole. The issue on appeal, therefore, is whether the "no parole" provision added to 18 U.S.C. § 841(b) by the 1986 amendments became effective before or after February 1987, when the instant offense was committed.

Ordinarily, a statute becomes effective as soon as it is signed into law in the absence of some provision to the contrary. *E.g., United States v. Stillwell*, 854 F.2d 1045, 1047 (7th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 508, 102 L.Ed.2d 544 (1988); *United States v. York*, 830 F.2d 885, 892 (8th Cir.1987), *cert. denied*, 484 U.S. 1010, 108 S.Ct. 1047, 98 L.Ed.2d 1010 (1988). If this general rule applies, then the "no parole" provision became effective on October 27, 1986, when President Reagan signed the Anti–Drug Abuse Act of 1986 into law. In that case, Robles' claim would fail.

Robles, however, contends that the Anti–Drug Abuse Act of 1986 expressly delayed the effective date of section 1002, including the "no parole" provision. He relies on our decision in *United States v. Byrd*, 837 F.2d 179 (5th Cir.1988), in which we were asked to determine the effective date of the 1986 amendment to section 841(b) requiring courts to impose a term of supervised release for drug offenses under that section. The supervised release requirement was substituted for the prior special parole term requirement as a part of the sweeping changes to 18 U.S.C. § 841(b) made by section 1002 of the Anti–Drug Abuse Act of 1986, the same section of the Act that added the "no parole" provision at issue in Robles' appeal. A different section of the Anti–Drug Abuse Act of 1986, section

---

5. Section 4205 was repealed by the Comprehensive Crime Control Act of 1984, Pub.L. No. 98–473, § 218(a)(5), 98 Stat. 1837, 2027. The original effective date of the repeal was November 1, 1986. *Id.* § 235(a)(1), 98 Stat. at 2031. In 1985, however, Congress delayed the effective date of the repeal until November 1, 1987. Sentencing Reform Amendments Act of 1985, Pub.L. No. 99–217, § 4, 99 Stat. 1728. Thus, section 4205 was still effective at the time of the offenses charged in the present case.

1004(a), replaced the phrase "special parole term" with "term of supervised release" throughout the federal narcotics laws.

Section 1002 of the Anti–Drug Abuse Act of 1986 does not expressly provide for its effective date. Section 1004(b) thereof, however, does expressly delay the effective date of the amendments made by section 1004(a) until November 1, 1987.[6] In *United States v. Byrd, supra,* this Court recognized that section 1002 had no specific effective date, but nonetheless held that the section 1004(a) change from special parole terms to supervised release included the change from special parole terms to supervised release in section 841(b) made by section 1002. Thus, the Court held that the delayed effective date provided for in section 1004(b) applied to the change from special parole to supervised release in section 841(b). The Court reasoned that Congress intended a single effective date for the changeover from special parole terms to terms of supervised release, and that this construction made for a more logical administrative arrangement. *See Byrd,* 837 F.2d at 181 n. 8.

The *Byrd* Court did not, however, hold that the section 1004(b) effective date applied to all of the changes made by section 1002. Section 1004(b) clearly does not have such a broad effect. The *Byrd* Court applied the section 1004(b) delayed effective date to the new supervised release provision in section 841(b) because it determined that Congress intended a single changeover date from special parole to supervised release. That reasoning does not apply to the remaining changes made by section 1002, which are independent of the changeover from special parole terms to terms of supervised release. Nothing in the statute indicates that the delayed effective date in section 1004(b) applies beyond the limited context of the changeover from special parole to supervised release, and we conclude that it does not.

Thus, there is no express provision for the effective date of the 1986 "no parole" amendment to 21 U.S.C. § 841(b). Under the general rule, that amendment became effective when signed into law on October 27, 1986. It was in effect in February 1987, when the cocaine distribution in the present case occurred. Therefore, a specific exception to the general parole requirement of section 4205(a) applied, and the district court correctly refused to allow parole on count two.

## IV. Imposition of a Special Parole Term

Robles next argues that the district court lacked statutory authority to impose a four-year special parole term to follow his prison term on the distribution count. We reject this contention.

### A. The development of the penalty provisions of section 841(b)

Section 841(b), both before and after the 1986 amendments, has prescribed penalties for violations of section 841(a). Prior to 1984, section 841(b)(1)(A) prescribed the penalty applicable to diverse offenses involving cocaine, authorized prison sentences of up to fifteen years, and required trial courts to impose a special parole term of not less than three years for any violation. Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub.L. 91–513, § 401, 84 Stat. 1236, 1260. In 1984, Congress amended section 841(b) to increase the maximum prison term for section 841(a) violations involving, *inter alia,* a kilogram or more of cocaine, from fifteen to twenty years. Comprehensive Crime Control Act of 1984, Pub.L. No. 98–473, § 502, 98 Stat. 1837, 2068. This new penalty was established in a new section 841(b)(1)(A), and the prior penalty statute, which continued in effect for violations involving, *inter alia,* less than a kilogram of cocaine, was redesignated section 841(b)(1)(B). *Id.* Whether intentionally or

---

**6.** Specifically, section 1004(b) provided: "The amendments made by this section shall take effect on the date of the taking effect of section 3583 of title 18, United States Code." Anti–Drug Abuse Act of 1986, Pub.L. No. 99–570, § 1004(b), 100 Stat. 3207, 3207–6. In turn, sec- tion 3583 became effective on November 1, 1987. Sentencing Reform Act of 1984, Pub.L. No. 98–473, § 235, 98 Stat. 1987, 2031, *amended by* Sentencing Reform Amendments Act of 1985, Pub.L. No. 99–217, § 4, 99 Stat. 1728.

inadvertently, Congress omitted the mandatory special parole term in the new section 841(b)(1)(A) created by the 1984 amendments. *Id.* Redesignated section 841(b)(1)(B), on the other hand, still included the old special parole requirement. Thus, the 1984 amendment created the anomaly that between 1984 and 1986 the penalty provision applicable to section 841(a) offenses involving *less* than a kilogram of cocaine included a mandatory special parole term requirement, while offenses involving a kilogram or more of cocaine apparently did not. *See United States v. De Los Reyes,* 842 F.2d 755, 758 n. 2 (5th Cir.1988); *United States v. Phungphiphadhana,* 640 F.Supp. 88, 89 (D.Nev.1986).

In the Anti–Drug Abuse Act of 1986, Congress again amended section 841(b), this time by completely striking both section 841(b)(1)(A) and section 841(b)(1)(B), and inserting new, entirely rewritten, sections 841(b)(1)(A) and 841(b)(1)(B) providing for even stricter penalties. The new section 841(b)(1)(A) authorized a penalty of up to life imprisonment for offenses involving, *inter alia,* five kilograms or more of cocaine, and new section 841(b)(1)(B) authorized imprisonment for up to forty years for offenses involving, *inter alia,* five hundred grams or more of cocaine. Both new sections also included mandatory terms of "supervised release" of not less than four years. Neither new section mentions "special parole." *See* Anti–Drug Abuse Act of 1986, Pub.L. No. 99–570, § 1002(2), 100 Stat. 3207, 3207–2 to –4.[7]

As discussed above, the Anti–Drug Abuse Act of 1986 also enacted a substitution of supervised release for special parole terms throughout the federal narcotics laws, effective November 1, 1987. As we have also noted, this Court held in *United*

*States v. Byrd, supra,* that the provisions requiring terms of supervised release in the new section 841(b) did not become effective until November 1, 1987, when the general changeover from special parole to supervised release became effective. But again, as discussed above, the rest of the changes to section 841(b) became effective immediately on October 17, 1986, when the Anti–Drug Abuse Act was signed by President Reagan. Robles' offense was committed in February 1987.

### B. The effect of quantity

■ Robles claims he was convicted of distributing one kilogram of cocaine, and that prior to the enactment of the 1986 amendments, section 841(a) offenses involving a kilogram or more of cocaine were not punishable by the imposition of a special parole term. Since he committed his offense prior to the effective date of the new supervised release term requirement, he argues, this pre-October 1986 law should have governed the penalty in his case. Therefore, he concludes, the decision of the district court to impose special parole upon him was error. For support, Robles relies on our decision in *United States v. De Los Reyes, supra.*

The defendant in *De Los Reyes* had pleaded guilty to possessing less than fifty kilograms of marihuana, a crime punishable by section 841(b)(1)(C) at the time of the offense (October 18, 1986), which expressly provided for special parole terms,[8] and thus that case refrained from deciding the issue for which Robles cites it. The Court did, however, discuss the ambiguity as to the law that would be applicable to offenses punishable pursuant to the pre-October 27, 1986 section 841(b)(1)(A), but that had occurred during the gap period. It suggested two ways this statutory ambiguity

---

**7.** New section 841(b)(1)(D), which had been designated section 841(b)(1)(C) prior to the 1986 amendments, does mention special parole. That section was not completely rewritten by the 1986 amendments, and thus continued to expressly include its old special parole term requirement until section 1004 of the Anti–Drug Abuse Act of 1986 effected the changeover to terms of supervised release throughout the narcotics laws on November 1, 1987. Section

841(b)(1)(D) is not applicable to the present case, however, because it prescribes penalties only for distribution offenses involving relatively small amounts of marihuana and hashish. *See* Pub.L. No. 99–570, §§ 1002(1), 1003(a)(1).

**8.** This was the provision redesignated as section 841(b)(1)(D) in the October 27, 1986 legislation. *See* note 7, *supra.*

might be resolved: (1) by simply substituting the phrase "special parole term" for "term of supervised release" in the new section 841(b) for these October 1986–November 1987 gap cases, or (2) by applying the law in effect just prior to the enactment of the 1986 amendments on the parole issue—in other words, by allowing special parole for all cases except those that would have fallen within the ambit of pre-October 17, 1986 section 841(b)(1)(A), which had omitted the special parole requirement. The *De Los Reyes* Court expressly refrained from deciding which approach should be applied until presented with a case in which the issue was properly before it. *United States v. De Los Reyes,* 842 F.2d at 758 n. 3.

Robles argues that because his crime falls within the gap period and would have fallen within the ambit of pre-October 1986 section 841(b)(1)(A), we must now decide the issue left open in *De Los Reyes,* that is, whether to apply prior (viz., pre-October 1986) law respecting special parole or to simply read "special parole term" for "term of supervised release" in section 841(b) for offenses committed during the October 1986–November 1987 gap. He urges the court to apply prior law, which he asserts will deny the district court authority to impose a special parole term on him.

Robles incorrectly assumes, however, that pre-October 1986 law did not authorize a special parole term for his distribution count. He erroneously asserts that he was convicted of distribution of one kilogram of cocaine. Count two of the indictment alleged distribution of "approximately one kilogram of cocaine," but the undisputed evidence at trial establishes that the quantity of cocaine actually delivered to Agent Gonzalez amounted only to 996 grams, some four grams short of a kilogram.[9]

Thus, the penalty provision of section 841(b) applicable to Robles' case was section 841(b)(1)(B), which prescribes penalties for distributing greater than five hundred grams. Prior to the 1986 amendments, the applicable penalty provision would have been the old section 841(b)(1)(B), which prescribed penalties for, *inter alia,* distributing less than a kilogram of cocaine. *See* Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub.L. 91–513, § 401(b)(1)(A), 84 Stat. 1236, 1260, *as amended by* Comprehensive Crime Control Act of 1984, Pub.L. No. 98–473, § 502, 98 Stat. 1837, 2068. As noted above, that section *did* require the imposition of a special parole term of not less than three years in addition to the term of imprisonment. *Id.* Thus, whichever of the approaches suggested by the *De Los Reyes* Court were applied, the district court would have been required to impose a special parole term for Robles' second count.

### C. The implicit special parole term requirement for gap offenses

■ Arguably, however, this analysis should not end our inquiry. There is a third possibility, not discussed in *De Los Reyes,* for dealing with the special parole issues in offenses occurring after the amended section 841(b) took effect October 27, 1986, and prior to the effective date of the supervised release requirements in that section on November 1, 1987. Since the new section 841(b) makes no reference whatsoever to special parole, and since all of that section except the supervised release term requirement became effective on October 27, 1986, one might persuasively argue that the new law eliminated the special parole term requirement for all violations of section 841(a) occurring in the gap period, regardless of the applicability of special parole prior to that date.[10] Sec-

9. The evidence concerning the sample that Franco produced to show the undercover agents affords no basis to conclude that the distribution count actually involved a full kilogram of cocaine. There is no evidence as to how large this sample was, and the record merely indicates that Franco offered to show the sample to Agent Gonzalez, who told Franco that he did not need to see it.

10. As indicated in note 7, *supra,* the statements in this sentence must be qualified for offenses governed by section 841(b)(1)(D) (formerly section 841(b)(1)(C)), which does provide for special parole (though not after November 1, 1987).

tion 1004(b), which provided for the delayed effective date of the changeover from special parole to supervised release, might have the implicit effect of preserving the special parole term requirement of pre-October 1986 law, but reading such an effect into that section requires a somewhat expansive construction of a criminal statute and the rule of lenity hence militates against imposing special parole terms for offenses occurring during the October 27, 1986–November 1, 1987 gap period. *Cf. Bifulco v. United States*, 447 U.S. 381, 100 S.Ct. 2247, 2258–59, 65 L.Ed.2d 205 (1980) (relying on the rule of lenity in the face of ambiguous congressional intent to hold that section 846, the narcotics conspiracy statute, does not authorize imposition of special parole terms).

Neither *Byrd* nor *De Los Reyes* unambiguously holds otherwise. The offense in *De Los Reyes* occurred on October 18, 1986, just prior to the effective date of the 1986 amendments, and hence prior to the beginning of the gap period.[11] The opinion in *Byrd* does not specify the date of the offense in that case, although it is perhaps inferable that it was during the gap. More recent cases in this Circuit, however, relying on *Byrd* and *De Los Reyes*, have clearly applied the special parole term requirement to section 841(b)(1)(B) offenses committed during this period. *See, e.g., United States v. Posner*, 865 F.2d 654, 657, 660 (5th Cir.1989) (February 1987 offense with sentence under section 841(b)(1)(B)); *United States v. Molina–Uribe*, 853 F.2d 1193, 1199 (5th Cir.1988) (December 1986 offense with sentence under section 841(b)(1)(B)). Other circuits have followed our lead. *See, e.g., United States v. Whitehead*, 849 F.2d 849, 860 (4th Cir.1988); *United States v. Smith*, 840 F.2d 886, 890 (11th Cir.1988). None of these cases provide any analysis in

support of this result, but rather assume that *Byrd* forecloses the issue. Nonetheless, these cases bind our decision today.

In light of this precedent, we must conclude that the provision of section 1004 of the Anti–Drug Abuse Act of 1986 that delayed the effective date of the supervised release requirement in section 841(b) also implicitly extended the application of the old special parole term requirements, at least insofar as those requirements existed just prior to the enactment of the 1986 amendments. Thus, at least for offenses subject to a special parole term requirement just prior to the enactment of the 1986 amendments, the special parole term requirement continued in effect until November 1, 1987.[12] Because Robles' distribution count is such an offense, we conclude that the district court did not err in imposing a special parole term upon him.

## V. Imposition of Consecutive Sentences

■■■ Finally, Robles challenges the district court's decision to order consecutive sentences for both conspiracy to distribute cocaine and the underlying substantive offense of distribution of a portion of the cocaine. This argument is foreclosed by our decision in *United States v. Prati*, 861 F.2d 82, 88 (5th Cir.1988), in which we held that conspiracy to possess cocaine with intent to distribute it and possession of cocaine with intent to distribute it, the object offense of the charged conspiracy, were separate crimes and could support separate consecutive sentences.[13]

### Conclusion

For the foregoing reasons, we conclude that Robles' appeal presents no reversible

---

**11.** Moreover, as noted, *De Los Reyes* involved the special case of an offense under section 841(b)(1)(C), which, as redesignated section 841(b)(1)(D) in the October 27, 1986 legislation, continued to refer to special parole terms. *See* notes 7 and 8, *supra*.

**12.** As in *De Los Reyes*, we are not faced with an offense that would have fallen within the ambit of pre-October 1986 section 841(b)(1)(A), and so

we need not decide whether a special parole term would be applicable for such an offense that was committed during the October 27, 1986–November 1, 1987 gap.

**13.** As the instant offenses were each committed prior to November 1, 1987, the sentencing guidelines are inapplicable. *United States v. Watson*, 868 F.2d 157, 158 (5th Cir.1989).

error and we affirm his conviction and sentence.

AFFIRMED.