UNITED STATES of America,
Plaintiff–Appellee,

v.

Salatil PRUNEDA–GONZALEZ, Alejandro Tamayo–Ramos, Heraclio Pena–Hernandez, and Ignacio Hernandez–Beltran, Defendants–Appellants.

No. 90–2700.

United States Court of Appeals,
Fifth Circuit.

Jan. 29, 1992.

Roland E. Dahlin, II, Federal Public Defender, Juan E. Gavito, Jose Gonzalez–Falla, Asst. Federal Public Defenders, Houston, Tex., for Gonzalez.

Jose Luis Pena, Harlingen, Tex., for Beltran–Hernandez & Ramos.

Alfredo Padilla, Brownsville, Tex., for Hernandez–Beltran & Pena–Hernandez.

Paula C. Offenhauser, James L. Turner, Asst. U.S. Attys., Ronald G. Woods, U.S. Atty., Houston, Tex., for U.S.

Before POLITZ, Chief Judge, SMITH, Circuit Judge, and FITZWATER,[*] District Judge.

FITZWATER, District Judge:

Four defendants appeal their convictions for conspiracy to possess with intent to distribute marihuana and possession with intent to distribute marihuana. Each defendant challenges the sufficiency of the evidence, and three defendants contend they established the defense of entrapment as a matter of law and proved government witnesses were improperly compensated on a contingent basis. We find no merit in any of these arguments and affirm.

I

We recount the evidence in the light most favorable to the verdict, affording the government the benefit of all reasonable inferences and credibility choices. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Nixon*, 816 F.2d 1022, 1029 (5th Cir.1987), *cert. denied*, 484 U.S. 1026, 108 S.Ct. 749, 98 L.Ed.2d 762 (1988).

On the morning of February 12, 1990 Gilberto Sauceda Salazar ("Salazar") approached defendant Ignacio Hernandez–Beltran ("Hernandez") to ask for a loan so that he could pay his light bill. Hernandez loaned Salazar $100 and asked him if he knew of anyone who could "help him move" approximately one hundred pounds of marihuana from Texas to Florida. Salazar told Hernandez he would attempt to find someone to do the job. Around 9:00 a.m.[1] Salazar approached Joe Perez ("Perez"), who agreed to transport the marihuana. That afternoon, Salazar telephoned Hernandez to inform him of this fact. Hernandez then told Salazar there were 300 pounds of marihuana to be transported.

Unknown to Salazar or Hernandez, Perez was a confidential informant for the Drug Enforcement Administration ("DEA"). Perez informed the DEA of the arrangement and, in turn, it established surveillance of the various participants.

At 2:17 p.m. Hernandez and an unidentified man drove in a Mercury Cougar to Salazar's house. Salazar left the two men at his home and drove to Perez's house to update Perez. When Salazar returned home, Hernandez and the other man departed.

At approximately 3:30 p.m. Salazar drove to his sister's house to obtain boxes to be used to transport the marihuana. When he returned, he telephoned Hernandez to inform him he had the boxes.

At approximately 3:50 p.m. a brown and beige van arrived at Salazar's house. According to the testimony of DEA Agent T.K. Solis ("Solis"), which we accept as favorable to the verdict, defendant Hernandez drove the van and defendants Salatil Pruneda–Gonzalez ("Pruneda") and Heraclio Pena–Hernandez ("Pena") accompanied Hernandez.[2] The three met with Salazar in his driveway for a few minutes. Pruneda and Pena then loaded empty cardboard boxes into the van as Hernandez and Salazar conversed. After loading was completed, Hernandez, Pruneda, and Pena took the

---

[*] District Judge of the Northern District of Texas, sitting by designation.

1. We set out the times of pertinent events because we find their relatively close proximity to lend support to the verdict.

2. Salazar testified that Pruneda brought the van and that the defendant wearing a blue T-shirt at trial accompanied him. Although the government requested, and the court ordered, that the record reflect Salazar had thus identified Hernandez, we think the government misspoke, since other testimony showed Pena was wearing a blue T-shirt, and Hernandez a plaid shirt, at trial. We need not resolve this ambiguity, however, because we accept Agent Solis' testimony as favorable to the verdict.

van to Hernandez's house, where it remained until that evening.

At approximately 7:02 p.m. the van departed from Hernandez's residence, arriving at Salazar's house at 7:16 p.m. According to the testimony of DEA Agent Larry Councilman ("Councilman"), which we accept as favorable to the verdict, defendants Alejandro Tamayo–Ramos ("Tamayo") and Pruneda were in the van.[3] Salazar testified the two occupants of the van both told him the vehicle was loaded with 500 pounds of marihuana. Salazar then called Perez, informed him the van was ready, drove the van to Perez's house, and walked back to his house. Thereafter, Hernandez and Pena arrived in a Mercury Cougar, carrying a bag containing money with which to pay Perez.[4] Both brought the money to Salazar, but Hernandez had the money in his hands. Hernandez told Salazar the bag contained $16,000, representing one-half payment in advance.

Defendants Hernandez, Pruneda, Pena, and Tamayo then left Salazar's house riding together in the Mercury Cougar. Shortly thereafter, Salazar went to Perez's house, where the van was parked, and gave the money to Perez. The four defendants headed northbound toward San Benito, Texas. Perez, driving the marihuana-laden van, took a similar route. Salazar followed Perez. DEA agents stopped all three vehicles shortly thereafter. The van that had been observed throughout the day, and that was then being driven by Perez, was found to contain seven boxes filled with a total of 593 pounds of marihuana.

## II

Defendants first seek reversal on the ground that the evidence is insufficient to sustain their convictions.

In deciding the sufficiency of the evidence, we determine whether, viewing the evidence and the inferences that may be drawn from it in the light most favorable to the verdict, a rational jury could have found the essential elements of the offenses beyond a reasonable doubt. *United States v. Chavez*, 947 F.2d 742, 744 (5th Cir.1991) (citing *Glasser*, 315 U.S. at 80, 62 S.Ct. at 469; *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc), *aff'd*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983)). It is not necessary that the evidence exclude every rational hypothesis of innocence or be wholly inconsistent with every conclusion except guilt, provided a reasonable trier of fact could find the evidence establishes guilt beyond a reasonable doubt. *Id.*

At the close of the evidence, only defendant Pruneda moved for judgment of acquittal pursuant to Fed.R.Crim.P. 29(a).[5] Because defendants Hernandez, Pena, and Tamayo failed to move for acquittal, we review the sufficiency of the evidence against them only to determine whether affirmance of their convictions would result in a "manifest miscarriage of justice."

---

**3.** Agent Councilman testified that Tamayo and *Pruneda* were in the van and that defendants Pena and Hernandez arrived later in a Mercury Cougar. Salazar testified that Tamayo and *Pena* arrived first in the van. We view the evidence and draw all reasonable inferences in favor of the verdict. This requires us to place *Pruneda* with Tamayo, given Salazar's testimony that the two admitted their knowledge of the contents of the van and of the approximate quantity of marihuana. We may draw this inference without also drawing a mutually inconsistent inference necessary to sustain the conviction of codefendant Pena. Even if Pena did not arrive with Tamayo, and thus did not evince knowledge of the contents of the van, the other evidence against him is sufficient to uphold his conviction.

Pruneda's attorney addressed in his closing argument the discrepancy between the testimony of Salazar and Agent Councilman on this point. Arguing it was "the crux of Pruneda's defense," he urged the jury that Salazar was perhaps correct and that the conflict in testimony presented reasonable doubt that should result in the acquittal of Pruneda. The jury chose not to accept this reasoning.

**4.** We accept Agent Councilman's testimony as more favorable to the verdict. Salazar testified that Pruneda—not Pena—arrived with Hernandez in the Mercury Cougar.

**5.** Pruneda's attorney attempted to make the motion when the government rested, but the trial judge allowed the motion only after all parties had rested. The attorney for the other three defendants did not move for acquittal.

*See United States v. Robles–Pantoja,* 887 F.2d 1250, 1254 (5th Cir.1989); *United States v. Hall,* 845 F.2d 1281, 1283 (5th Cir.), *cert. denied,* 488 U.S. 860, 109 S.Ct. 155, 102 L.Ed.2d 126 (1988). This occurs only if the record is "devoid of evidence pointing to guilt." *Robles–Pantoja,* 887 F.2d at 1254 (quoting *United States v. Ivory,* 468 F.2d 613, 614 (5th Cir.1972)). We review Pruneda's argument under the *Glasser v. United States* standard.

## A

 We have little difficulty concluding the record is sufficient to sustain the convictions of Tamayo, Pena, and Hernandez. In order to prove the offense of conspiracy to possess with intent to distribute marihuana in violation of 21 U.S.C. §§ 846 and 841(a)(1), the government was required to prove beyond a reasonable doubt (1) the existence of an agreement between two or more persons to possess marihuana with the intent to distribute it, and (2) the defendant's knowledge of, (3) intention to join, and (4) voluntary participation in the conspiracy. *See United States v. Lechuga,* 888 F.2d 1472, 1476 (5th Cir.1989) (cocaine conspiracy case). The government need not establish the agreement by direct evidence; the jury may infer such an agreement from circumstances. *United States v. Singh,* 922 F.2d 1169, 1173 (5th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 2066, 114 L.Ed.2d 471 (1991). In order to prove the offense of possession with intent to distribute marihuana, in violation of 21 U.S.C. § 841(a)(1), the government was required to prove beyond a reasonable doubt the (1) knowing (2) possession of marihuana (3) with intent to distribute it. *United States v. Williams–Hendricks,* 805 F.2d 496, 500 (5th Cir.1986). A jury may infer a defendant's intent to distribute marihuana from the possession of a large amount. *United States v. Prieto–Tejas,* 779 F.2d 1098, 1101 (5th Cir.1986).

 The trial record is not devoid of evidence pointing to the guilt of Tamayo, Pena, and Hernandez. Viewed favorably to the jury's verdict, the evidence shows

Hernandez asked Salazar on February 12, 1990 if he knew of anyone who could "help him move" marihuana from Texas to Florida. Salazar arranged for Perez to do the job and so informed Hernandez. Later that day, Hernandez went to Salazar's house, departed, and returned in a van. Two men loaded the van with empty boxes from Salazar's pickup truck while Hernandez and Salazar conferred. The van then returned to Hernandez's house, where it remained for several hours. At approximately 7:02 p.m. two codefendants drove the van to Salazar's house and told Salazar the van was loaded with 500 pounds of marihuana. Hernandez arrived a short time later and delivered to Salazar a paper bag containing money that Perez was to be paid for transporting the marihuana to Florida. Hernandez and three codefendants then departed from Salazar's house and appeared to be driving in the same direction as was Perez. The van was found to be filled with 593 pounds of marihuana.

We think the evidence is adequate to establish Hernandez was guilty of the offenses of conspiracy and possession with intent to distribute. The record certainly is not devoid of evidence pointing to guilt.

We similarly conclude the evidence against defendant Tamayo is sufficient to sustain his convictions. Accompanied either by Pruneda or Pena,[6] Tamayo drove the van to Salazar's house and told Salazar the van contained 500 pounds of marihuana. Tamayo thereafter departed from Salazar's house together with the other three defendants, apparently driving in the same direction as Perez and the marihuana-laden van. The trial record is not devoid of evidence pointing to Tamayo's guilt for conspiracy and knowing possession of marihuana with intent to distribute it.

Nor is the evidence insufficient to uphold Pena's convictions. At approximately 3:50 p.m., accompanied by Hernandez and Pruneda, Pena arrived in the van at Salazar's house. Pena and Pruneda loaded the empty boxes into the van. While this activity alone is not evidence of guilt, Pena and

---

6. We need not decide whom for purposes of the present inquiry.

Hernandez returned to Salazar's house that evening with the money to be paid to Perez for moving the marihuana to Florida. Salazar testified that both men brought the money, although Hernandez handed Salazar the sack.[7] Pena accompanied the other defendants in the same vehicle as they departed from Salazar's house, apparently driving in the same direction as Perez. This evidence refutes the contention that the record lacks evidence pointing to Pena's guilt.

### B

We now turn to the question whether the evidence is sufficient to uphold Pruneda's convictions. Because Pruneda moved for a judgment of acquittal, we must decide whether a rational trier of fact could have found the essential elements of his crimes beyond a reasonable doubt.

On the basis of our decision in *United States v. Gardea Carrasco*, 830 F.2d 41 (5th Cir.1987), Pruneda urges that his convictions must be set aside. In *Gardea Carrasco* we reversed one of three defendants' convictions for conspiracy to possess marihuana with intent to distribute and for possession of marihuana with intent to distribute. *Id.* at 45. The evidence showed the defendant, on two separate days, accompanied a codefendant to an airport where negotiations to transport marihuana took place. *Id.* at 42–43. On the first occasion the defendant remained in the car and did not actually participate in the conversations. *Id.* at 42. The next day the defendant returned to the airport with both codefendants. But the pertinent conversations occurred out of his earshot. *Id.* at 43. The defendant was not shown to have been involved in loading the marihuana in suitcases or transporting the suitcases to the airport. *Id.*

Later the second day, the defendant and a codefendant arrived at the airport. A witness testified "they" told her to radio a pilot, who was to transport the marihuana, to return to the airport. The witness did not specify whether the defendant in particular made the request. *Id.* When the pilot returned and began refueling, the defendant and a codefendant transferred three suitcases from a pickup truck to the plane, following which law enforcement officers intervened. *Id.* The suitcases contained marihuana.

We reversed the defendant's conspiracy conviction. The evidence showed the defendant accompanied a codefendant to the airport on two occasions and helped transfer suitcases full of marihuana from a pickup truck to the plane, other evidence placed a codefendant at the defendant's house at various times on the two days in question, and testimony established that on a date 25 days earlier the codefendant took three suitcases into the defendant's house. We nevertheless held the evidence was insufficient to support the conviction. *Id.* at 45. No direct or circumstantial evidence established the defendant was privy to the content of the two conversations or knew the content of the suitcases he helped transfer from the pickup truck to the airplane. The suitcases delivered to the defendant's house 25 days earlier were not proved to be the same suitcases used to transport the marihuana. *Id.* The defendant's association with conspirators and his presence at the airport at the time the marihuana was transferred were not enough to prove beyond a reasonable doubt that he knew of and voluntarily joined in the conspiracy. *Id.*

We also reversed the defendant's conviction for possession with intent to distribute, because the government failed to prove beyond a reasonable doubt that the defendant knew what the suitcases contained or why he was to accompany them on the flight to their destination. *Id.*

7. We recognize the record also supports the finding that Pena—together with Tamayo—had earlier arrived in the van, telling Salazar the van was filled with 500 pounds of marihuana. In order to draw the inferences necessary to support the verdict as to Pruneda, we have drawn only consistent inferences regarding Pena. Therefore, although Salazar's testimony provides additional support for the convictions of Pena, we choose not to rely upon the portion of the testimony regarding Pena's admission of knowledge of the contents of the van.

We think the evidence against Pruneda is distinguishable from that in *Gardea Carrasco* and is sufficient to have permitted a rational jury to find the elements of both offenses beyond a reasonable doubt. Viewed favorably to the verdict, the record reflects that a conspiracy to possess marihuana with intent to distribute it was formed between Salazar and Hernandez the morning of February 12, 1990. That afternoon, at approximately 3:50 p.m., Pruneda, Hernandez, and Pena arrived at Salazar's house in the van that Perez used to transport the contraband. As Salazar and Hernandez talked, Pruneda and Pena loaded empty boxes into the van. The three departed together.

■ Within four hours, at 7:16 p.m., Pruneda and Tamayo returned in the van to Salazar's house. They both[8] told Salazar the vehicle was loaded with 500 pounds of marihuana.[9] After Hernandez and Pena arrived and Hernandez delivered payment to Salazar, Pruneda and the other three defendants departed Salazar's house in the same vehicle, apparently driving in the direction taken by Perez and the van filled with marihuana.

This evidence is sufficient for a jury to find beyond a reasonable doubt that a conspiracy of two or more persons was formed to possess marihuana with intent to distribute it, and that Pruneda knew of, intended to join, and voluntarily participated in the conspiracy. It is also adequate to support the findings that Pruneda knowingly possessed marihuana with intent to distribute it.

In *Gardea Carrasco* the defendant was not shown to have had knowledge of the contents of the suitcases or to have been part of pertinent conversations. In the present case the evidence—viewed favorably to the verdict—permitted the jury to find Pruneda admitted he had knowledge of the contents of the van and even of the approximate quantity of marihuana (500 pounds versus 593 pounds actually seized). The circumstantial evidence in the record is also stronger. In *Gardea Carrasco* the defendant participated in events that transpired on two different days, and that could be considered discrete in the sense that the first trip to the airport involved only a conversation that the defendant did not hear and the second trip included the defendant's transfer of suitcases from a vehicle to an airplane. In the present case, Pruneda participated at Salazar's house in loading empty boxes in a van within hours after the formation of the conspiracy, returned approximately two and one-half hours later to Salazar's house in the same van (this time laden with 593 pounds of marihuana), and shortly thereafter left the Salazar residence with three coconspirators who had active roles in the offenses. We recognize the settled rule that "[m]ere presence at the crime scene is insufficient to support an inference of participation in the conspiracy." *Chavez*, 947 F.2d at 745. But the jury is permitted to "consider presence and association, along with other evidence, in finding conspiratorial activity by the defendant." *Id.* We think it a reasonable inference to be drawn from the evidence that the three defendants would not have permitted Pruneda to accompany

---

8. Unlike the evidence in *Gardea Carrasco*, in which we faulted as too general a collective reference to two codefendants as "they," *see* 830 F.2d at 43, in the present case Salazar testified "they both" told him the contents of the van.

9. We recognize in assuming that *Pruneda* and Tamayo told Salazar the van contained 500 pounds of marihuana, that we must accept Salazar's testimony that two men told him this but reject his testimony that it was Tamayo and *Pena* who did so, in favor of Agent Councilman's testimony that Tamayo and *Pruneda* arrived together in the van. But this is precisely what a jury is permitted to do. Not only is a jury "free to choose among reasonable construc-

tions of the evidence," *Chavez*, 947 F.2d at 744, it is afforded the latitude to "choose to believe part of what a witness says without believing all of that witness's testimony." *United States v. Merida*, 765 F.2d 1205, 1220 (5th Cir.1985). Because we view the evidence favorably to the verdict, and since we do not accept mutually inconsistent propositions of fact by doing so, *see supra* note 7, we accept the part of Salazar's testimony that the incriminating statements were made by both men, but credit Agent Councilman's testimony concerning who the only two men were who could have made the statements.

them in performing tasks vital to the success of the crimes—undertaken within so close a time frame as to indicate knowledge of, and intentional participation in, crimes in progress—had Pruneda not knowingly and intentionally joined the venture.

We uphold all four convictions under the applicable evidentiary standard.

### III

Defendants Tamayo, Pena, and Hernandez contend their convictions must be reversed because the record establishes the defense of entrapment as a matter of law. They urge that Salazar, who pleaded guilty and testified at trial for the government, and Perez, the confidential informant and also a government witness, were both government agents and that Salazar's arrest and indictment were simply a charade to assist in the prosecution of the other defendants. We reject this contention.

■ Entrapment is an affirmative defense that requires a defendant to show he was induced to commit a criminal act by a government agent and that he was not predisposed to commit the act without the inducement. *See Mathews v. United States,* 485 U.S. 58, 63, 108 S.Ct. 883, 886, 99 L.Ed.2d 54 (1988). " 'Entrapment, as a doctrine, asks ... what was the defendant's mind *before* he did the charged acts.' " *United States v. Kang,* 934 F.2d 621, 624 (5th Cir.1991) (quoting *United States v. Henry,* 749 F.2d 203, 213 (5th Cir.1984) (en banc) (emphasis in original)). "The critical determination is whether the criminal intent or design originated with the defendant or with the government agents." *Id.* (citing *United States v. Nations,* 764 F.2d 1073, 1079 (5th Cir.1985)).

■ To rely upon the entrapment defense, the defendant must as a threshold matter "present evidence that government conduct 'created a substantial risk that an offense would be committed by a person other than one ready to commit it.' " *Id.* (quoting *United States v. Johnson,* 872 F.2d 612, 620 (5th Cir.), *reh'g denied,* 880 F.2d 413 (1989)). This requires the defendant to establish (1) that he lacked predisposition to commit the crime and (2) that government involvement and inducement amounted to more than just an opportunity to commit the crime. *Id.* "If the defendant succeeds in meeting his burden, the government must prove beyond a reasonable doubt that the defendant was predisposed to commit the offense." *Id.*

■ We do not find that any of the three defendants in question met the requirements to shift the burden to the government. According to the record, Hernandez asked Salazar whether he knew of anyone who could "help him move" the marihuana. Salazar did not initiate the discussion. Hernandez's criminal intent did not originate with Salazar, even if we conclude *arguendo* that the record supports a finding that he was a government agent. Hernandez's dealings with Perez occurred as a consequence of Hernandez's actions and at his own insistence. Tamayo and Pena were apparently recruited by Hernandez. Neither one dealt with Perez and could not have been entrapped to commit the offenses by virtue of his actions. Their criminal participation had already begun by the time they came in contact with Salazar. We conclude the record does not demonstrate the defense of entrapment as a matter of law. The burden on this issue never shifted to the government.

### IV

Hernandez, Pena, and Tamayo also seek reversal on the ground that Salazar and Perez were working for a contingent fee. We find this argument to be without merit.

■ In *United States v. Cervantes–Pacheco,* 826 F.2d 310 (5th Cir.1987) (en banc), *cert. denied,* 484 U.S. 1026, 108 S.Ct. 749, 98 L.Ed.2d 762 (1988), we held that an informant who is promised a contingent fee by the government is not disqualified from testifying in a federal criminal trial. *Id.* at 315. Nevertheless, adequate safeguards placed to protect against abuses must be observed. The government must not deliberately use or encourage the use of perjured testimony; it must make a complete and timely disclosure of the fee arrangement in accordance with *Brady v. Maryland;* the accused must have an adequate opportunity to cross-examine the informant and government agents about the agree-

**198**

ment; and the trial court should carefully instruct the jury about the suspect credibility of a compensated witness. *Id.* at 315–16.

 We hold that all necessary safeguards were observed in the present case and that there is no basis to disturb the convictions. The government has not been accused of suborning perjury. It plainly disclosed the fee arrangement to the defendants as required by *Brady.* The trial record clearly establishes that both defense attorneys cross-examined Salazar about his plea bargain. One attorney, through cross-examination, tried to impeach Salazar both as a paid witness and as one benefiting from a reduced charge. Perez and DEA agents testified at the trial and were subject to appropriate cross-examination. The trial judge properly cautioned the jury regarding the testimony of Salazar and Perez. The contingent fee argument therefore presents no basis to reverse the defendants' convictions.

\* \* \* \* \* \*

We conclude the defendants' contentions are without merit. Their convictions are therefore

AFFIRMED.