**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 92-2040
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

JOSE ARMANDO MALTOS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Texas
(CR H 91 0088 03)

_____

(November 30, 1992)

Before REAVLEY, SMITH, and DeMOSS, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]

Jose Armando Maltos ("Maltos") appeals his conviction, by a jury, of one count of conspiracy to possess with intent to distribute in excess of five kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. Finding the evidence insufficient as a matter of law to sustain the jury's verdict, we reverse.

---

[*] Local Rule 47.5.1 provides: "The publication of opinions that have no precedential value and merely decide particular cases on the basis of well-settled principles of law imposes needless expense on the public and burdens on the legal profession." Pursuant to that rule, the court has determined that this opinion should not be published.

Sometime before May 12, 1991, members of the Houston High Intensity Drug Trafficking Area Task Force established surveillance on two individuals believed to have been engaged in narcotics trafficking in Houston, Texas. On May 12, a surveillance team followed a Chevrolet Blazer occupied by Roman Suarez and Antonio Rios, Maltos's codefendants, and being driven from Houston to San Antonio, Texas.

The surveillance team observed Rios stop at a Denny's Restaurant, where Suarez proceeded to make a number of telephone calls from a pay phone. Shortly afterwards, a pickup truck arrived, and Suarez entered the truck and left, while Rios remained behind.

Agents following the truck observed it making "heat" runs and eventually followed it to a residence at 154 East Ackard Street, San Antonio. Suarez and the driver entered and remained inside for approximately one hour. The two then drove back to the restaurant, where Suarez got back into Rios's vehicle. The unidentified driver then drove the pickup truck to a motel parking lot adjacent to the restaurant, where he parked the truck and left the area on foot; the driver was not seen again. Rios and Suarez left the restaurant parking lot and set out in the direction of downtown San Antonio.

At 3:45 p.m., Maltos and his brother, Rolando Maltos ("Rolando") arrived at the motel in a gray Ford LTD. Rolando entered the abandoned pickup truck and drove to South Park Mall; Maltos followed him in the gray LTD. At the mall, the brothers proceeded

to the Chelsea Pub, where five minutes later Rios and Suarez joined them for a thirty-minute meeting.

After the meeting, surveilling police followed the Maltos brothers to the East Ackard address. Rolando left the pickup truck and entered the gray LTD with Maltos. Together, they drove to the Amber apartments complex, where Maltos parked his vehicle on the street and entered a blue Mercury parked in the apartment complex lot. The brothers then proceeded in their separate cars to a gas station, where Maltos fueled the Mercury, while Rolando used a pay phone. From the gas station, Rolando returned to the East Ackard residence; the police were unable to keep track of Maltos. At this time, agents noticed that a black-over-white Ford LTD was now parked at the East Ackard house.

Surveillance agents followed the Blazer in which Rios and Suarez were traveling east on Interstate 10 toward Houston. At Highway 6 near Houston, Rios and Suarez met up with Maltos, driving the Mercury in which he had last been seen. Both vehicles then proceeded southbound on Highway 6 to another mall, where Suarez used a pay phone while Maltos waited in the Mercury. Both vehicles then left the mall, Maltos following Rios, for the Ashford Creek Apartments, where Maltos parked his car and left with Rios in his. They proceeded to a Fiesta Mart parking lot, where they met Suarez. Maltos again switched cars, exiting Rios's vehicle and leaving with Suarez in a silver Toyota pickup truck.

Suarez drove to a nearby liquor store to use a pay phone. Suarez and Maltos then drove past the Mercury, still parked at the

apartments, and agents noted that the taillights of the truck lit up, indicating that the car had slowed so that Maltos could point out the location of the Mercury to Suarez. The truck regained speed, eventually stopping at a convenience store, where Suarez again made some calls from a pay phone. Agents observed the truck repeat this behavior )) successive stops to make calls from public phones )) before they lost track of the vehicle containing Suarez and Maltos.

At about 10:00 p.m., Rios arrived at the Ashford Creek Apartments. The police followed the Blazer and the Mercury to the Hector Torres residence at 11103 Kerwin Street, where the Blazer made several "heat runs." The driver of the Mercury got out and entered the Torres residence, re-emerging five minutes later after various vehicles had been moved to facilitate the Mercury's access to the garage. Agents would later seize 294 kilograms of cocaine from the residence during the execution of a search warrant.

The Mercury remained in the garage until the next morning, when, at approximately 8:00 a.m., agents watched it being taken from the garage with the rear end "jacked up" very high. The car was driven to a local Motel 6 in that condition, where it was left in the motel parking lot. Shortly thereafter, Suarez and Maltos emerged from the motel, and Maltos opened the trunk of the Mercury with a key in his possession. One of the two (it is not clear which) then lowered the air shocks to an apparently normal condition. After a brief conversation with Suarez, Maltos returned the Mercury to San Antonio, interrupting his trip one time to make

4

several calls from a pay phone.

When he arrived back at the Amber apartments in San Antonio, Maltos was met by the silver Toyota truck in which agents earlier had observed him with Suarez. He left the apartments as a passenger, and the driver proceeded to another public phone to make several calls. Approximately ten minutes later, they returned to the Amber apartments. Sometime during the intervening ten minutes, Rolando Maltos had joined Maltos and the driver of the truck.

At the apartments, Maltos walked behind the complex and emerged shortly thereafter, driving the same Ford LTD in which he had been observed the previous day. He was not tailed, but agents later observed him backing the car up to Apartment 28 at 1831 Sherwood Forest, sometime after 6:00 p.m. that evening. The car left almost immediately, driven by Rios to a local La Quinta motel parking lot where he left it.

Suarez and Maltos were later observed at the La Quinta between 9:00 and 9:30 p.m., Suarez arriving in the Blazer and Maltos driving the silver Toyota pickup. Both Suarez and Maltos made several calls from the motel's public phones. At this time, surveillance agents arranged to have the Ford LTD searched by a dog trained to sniff out drugs. The dog alerted to the trunk of the LTD.

On May 15, 1991, a search warrant was executed, resulting in the seizure of eight green duffle bags and a black plastic garbage bag of cocaine found under the stairs at the Sherwood Forest apartment where Maltos had previously left the Ford LTD. In all,

5

225 kilograms of cocaine were seized.

Prior to the arrests of the defendants on May 15th, surveillance agents assigned to Suarez and Rios observed Suarez leave a room at a Motel 6 and proceed next door to a gas station where he made several calls from the pay phone. He remained at the station approximately ten to fifteen minutes, then returned to his motel room. Shortly thereafter, Rios arrived at the motel and entered the same room.

Prior to Rios's arrival, Suarez had left the room twice to make more phone calls, again at public pay phones. After Rios's arrival, the two left the motel together, stopping several times along the way to make still more calls from public phones. Eventually, the two arrived at a travel agency in South Houston, where they remained approximately one to one and one-half hours. Upon leaving, they entered a Mexican restaurant in the same mall, remaining there for a similar period of time.

When Suarez and Rios left the restaurant, they made additional stops to place phone calls. When they arrived later at the Memorial City mall, Suarez was observed using his cellular phone before entering the mall. Yet on their return to the Motel 6, the two again stopped at a mall to use the public phones. Finally, Suarez and Rios arrived back at the motel at approximately 6:30 p.m. As they proceeded toward room 221, they were met on the staircase by Maltos and one Maximeno Hernandez, whereupon all four were arrested. Later, Maltos signed a consent-to-search form for room 221, claiming it was his. The motel's records, however,

showed that the room had been rented by Suarez.

II.

Maltos raises two issues on appeal.  His first issue is that the evidence was insufficient to uphold his conviction on the conspiracy charge.  Second, Maltos contends that his acquittal on the substantive charges of aiding and abetting the possession with intent to distribute and distribution in excess of five kilograms of cocaine (counts two and three of the indictment, respectively) reflects an inconsistent verdict necessitating the reversal of his conviction on the conspiracy charge (count one).

In evaluating the sufficiency of the evidence, a reviewing court must consider the evidence in the light most favorable to the verdict and determine whether a rational jury could have found the essential elements of the offense beyond a reasonable doubt. Glasser v. United States, 315 U.S. 60, 80 (1942); United States v. Chavez, 947 F.2d 742, 744 (5th Cir. 1991).  Our evaluation must give the government the benefit of all reasonable inferences and credibility choices.  United States v. Hernandez-Palacios, 838 F.2d 1346, 1348 (5th Cir. 1988).

In a drug conspiracy prosecution under 21 U.S.C. §§ 841(a)(1) and 846, the government must prove beyond a reasonable doubt (1) the existence of an agreement between two or more persons to violate the narcotics laws, (2) that the defendant knew of the agreement, and (3) that he voluntarily participated in the agreement.  United States v. Gallo, 927 F.2d 815, 820 (5th Cir.

7

1991).  The government need not prove the essential elements by direct evidence alone.  "The agreement, a defendant's guilty knowledge and a defendant's participation in the conspiracy all may be inferred from the `development and collocation of circumstances.'"  United States v. Lentz, 823 F.2d 867, 868 (5th Cir.) (quoting United States v. Vergara, 687 F.2d 57, 61 (5th Cir. 1982)), cert. denied, 484 U.S. 957 (1987).

While "presence or association is one factor that the jury may rely on, along with other evidence, in finding conspiratorial activity by a defendant,"  United States v. Magee, 821 F.2d 234, 239 (5th Cir. 1987), it is well established that mere presence at the crime scene or close association with conspirators, standing alone, will not support an inference of participation in the conspiracy. United States v. Fitzharris, 633 F.2d 416, 423 (5th Cir. 1980), cert. denied, 451 U.S. 988 (1981).  And while circumstantial evidence may be particularly valuable in proving the existence of the conspiratorial agreement, we have repeatedly stressed that we will not lightly infer a defendant's knowledge of and participation in a conspiracy.  United States v. Jackson, 700 F.2d 181, 185 (5th Cir.), cert. denied, 464 U.S. 842 (1983).  Thus, the government may not prove up a conspiracy merely by presenting evidence placing the defendant in "a climate of activity that reeks of something foul."  Id. (quoting United States v. Galvan, 693 F.2d 417, 419 (5th Cir. 1982)).

Maltos argues that the government failed to prove that he knew of, or intentionally participated in, a conspiracy, or that any

8

connection he may have had with the conspirators went beyond mere presence at the scene of criminal activity or innocent association with one or more of the conspirators. The government counters that the jury reasonably could infer Maltos's guilt on the conspiracy count by the obvious relationship between himself and the three other prime conspirators )) Suarez, Rios, and the defendant's brother, Rolando Maltos. In addition, Maltos's presence at various times and places coincided to a remarkable extent with that of the conspirators and of the cocaine ultimately seized. Citing to our recent decision in United States v. Pruneda-Gonzalez, 953 F.2d 190, 196-97 (5th Cir.), cert. denied, 112 S. Ct. 2952 (1992), the government asserts that the jury reasonably could have inferred that his co-defendants would not have permitted Maltos to accompany them in the performance of tasks central to their illegal operation had he not been in on the conspiracy. The government concludes, "The confluence of these circumstances in time and place fully support [sic] the jury's verdict."

Despite the undeniable "flurry of activity" presented by the facts of this case, see Galvan, 693 F.2d at 420; Vergara, 687 F.2d at 61, and the concomitant certainty that a conspiracy existed, we do not believe the jury reasonably could have found Maltos guilty beyond a reasonable doubt. Our cases seem to call for something more than what the evidence showed in this case, namely, Maltos's association with individuals engaged in the transport of cocaine and his presence during the transport of two shipments of such contraband. Although damning when viewed cumulatively, this is a

9

classic example of the type of evidence upon which we have prohibited the basing of conspiracy convictions. Fitzharris, 633 F.2d at 423.

The evidence presented in the instant case compares less with Pruneda-Gonzalez, urged by the government, than the case we distinguished in reaching our decision therein. In United States v. Gardea Carrasco, 830 F.2d 41 (5th Cir. 1987), we reversed a drug conspiracy conviction based upon the insufficiency of the evidence to support it. The defendant's participation in the alleged conspiracy there is factually quite similar to that in the instant case:

> The evidence showed the defendant accompanied a codefendant to the airport on two occasions and helped transfer suitcases full of marihuana from the pickup truck to the plane, other evidence placed a codefendant at the defendant's house at various times on the two days in question, and testimony established that on a date 25 days earlier the codefendant took three suitcases into the defendant's house. . . . No direct or circumstantial evidence established the defendant was privy to the content of the two conversations or knew the content of the suitcases he helped transfer from the pickup truck to the airplane. The suitcases delivered to the defendant's house 25 days earlier were not proved to be the same suitcases used to transport the marihuana. The defendant's association with conspirators and his presence at the airport at the time the marihuana was transferred were not enough to prove beyond a reasonable doubt that he knew of and voluntarily joined in the conspiracy.

Pruneda-Gonzalez, 953 F.2d at 195 (citations omitted).

While no case will prove likely to be on all fours with the pattern of facts presented by the case before us, the parallels in Pruneda to Maltos's participation are obvious. Other than evidence of Maltos's association with the conspirators, and his presence at

10

the time of the transactions, the government presented no proof establishing his knowledge of, or participation in, the conspiracy. As in Gardea Carrasco, no evidence established that Maltos knew the content of the myriad phone calls his codefendants placed from public phones or that his own conversations, whether by phone or during meals with his codefendants, concerned the drug transactions. Also as in Gardea Carrasco, no evidence )) direct or circumstantial )) demonstrated that he knew the contents of the cars he was transporting, or even that they contained contraband at the time he was transporting them.

Although a dog trained to sniff out contraband alerted to the trunk of the car Maltos had been driving, no evidence was presented that in fact drugs were present in the car or that any such drugs had been put there with Maltos's knowledge of the fact. Nor will Maltos's presence while one of the conspirators lowered the air shocks on the Mercury suffice to establish his complicity. Our case law in this regard simply demands more in order to prove individual knowledge and participation.[1]

By comparison, each of the cases relied upon by the government reveals )) in addition to the defendant's association with and participation in criminal activity )) some further circumstance

---

[1] See United States v. Espinoza-Seanez, 862 F.2d 526, 537-39 (5th Cir. 1988) (evidence insufficient where defendant drove conspirators to rendezvous and was arrested with a cellular phone and $1,700 in his possession); United States v. Blessing, 727 F.2d 353, 355-56 (5th Cir. 1984) (conviction reversed where evidence only established defendant and codefendant arrived by plane and checked into and out of hotel together, and defendant rented in his name a car and van used by coconspirators in furtherance of conspiracy), cert. denied, 469 U.S. 1105 (1985); Jackson, 700 F.2d at 185-86 (reversing where evidence indicated that defendant joined coconspirators in restaurant, but did not show his knowledge of nature or purpose of meeting or that a large sum of money was present, or that he participated in discussions involving drug transactions).

11

from which the jury reasonably could infer his specific knowledge and willful participation. In <u>Pruneda-Gonzalez</u>, for example, we allowed the jury to infer these elements based upon the fact that the acts in furtherance of the conspiracy were completed within a narrow time frame. We thus found it a reasonable inference that "the three defendants would not have permitted Pruneda to accompany them in performing tasks vital to the success of the crimes )) <u>undertaken within so close a time frame as to indicate knowledge of, and intentional participation in, crimes in progress</u> )) had Pruneda not knowingly and intentionally joined the venture." 953 F.2d at 196-97 (emphasis added). The time frame in the instant case )) in which the transactions occurred over a two- to three-day period )) as well as the evidence adduced as to defendant's knowledge, clarify that Maltos's predicament parallels the defendant's in <u>Gardea Carrasco</u>, not <u>Pruneda</u>:

> In <u>Gardea Carrasco</u> the defendant was not shown to have had knowledge of the contents of the suitcases or to have been part of pertinent conversations. In the present case the evidence )) viewed favorably to the verdict )) permitted the jury to find Pruneda admitted he had knowledge of the contents of the van and even of the approximate quantity of marihuana . . . . The circumstantial evidence in the record is also stronger. In <u>Gardea Carrasco</u> <u>the defendant participated in events that transpired on two different days</u> . . . .

<u>Id.</u> at 196 (emphasis added).[2]

In summary, we must conclude that the evidence adduced by the government at trial, when viewed in the light most favorable to the

---

[2] <u>Cf. United States v. Chavez</u>, 947 F.2d at 745 (evidence sufficient where defendants found actually unloading bags of cocaine from truck); <u>United States v. Rodriguez-Mireles</u>, 896 F.2d 890, 892-93 (5th Cir. 1990) (footprint evidence supported inference of both existence of conspiracy and defendant's knowing participation in it).

verdict, cannot support an inference of Maltos's guilt beyond a reasonable doubt.    Although Maltos presented no alternative explanations for his conduct, he bore no burden of proof to do so. Espinoza-Seanez, 862 F.2d at 538.    Although we give all due deference to the jury's weighing of facts and credibility, the question before us simply concerns whether the undisputed material facts may suffice to convict Maltos beyond a reasonable doubt.

The evidence in this case shows little beyond that "climate of activity that reeks of something foul," Jackson, 700 F.2d at 185, proximity to which cannot sustain a conspiracy conviction.    We conclude that Jose Armando Maltos's conviction for conspiracy must be reversed.    We therefore do not reach his second issue contesting the allegedly inconsistent jury verdict.

REVERSED.