**REVISED**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

No. 94-60730
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ROY C. BRADFIELD and
LEE ANDREW WILLIAMS,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Mississippi
_____

January 9, 1997

Before POLITZ, Chief Judge, and WIENER and STEWART, Circuit Judges.

WIENER, Circuit Judge:

Defendants-Appellants Roy C. Bradfield and Lee Andrews Williams appeal their convictions for conspiracy to possess with intent to distribute cocaine in violation of 21 U.S.C. §§841(a)(1) and 846. For the reasons set forth below, we affirm Williams' conviction but reverse Bradfield's and remand his case for a new trial.

I.

FACTS AND PROCEEDINGS

The events giving rise to Bradfield's and Williams' indictments and ultimate convictions arose in the context of a reverse-sting operation orchestrated largely by the FBI's

confidential informant, John Lee Chancey, Jr.  The sting targeted Bradfield directly.

Bradfield is a forty-year-old truck driver from Benton, Mississippi.  On a trucking job in 1991, he met two other drivers, Chancey and Juan Guerero, for the first time.  While waiting for their trucks to be unloaded, Guerero and Chancey began talking about cocaine and weapons deals.  The only evidence in the record of this conversation is Chancey's testimony, from which it is unclear whether Bradfield participated in the conversation or merely listened.  Chancey testified initially that Bradfield "was just laying aside . . . just hearing it."  Chancey testified later, however, that he told Bradfield to call Guerero if he (Bradfield) wanted to do a deal but that Chancey would not do a deal until the current trucking job was completed.  None dispute that Bradfield and Chancey did not make an agreement that day to do a deal, and that Bradfield left without even bothering to get Chancey's telephone number.

Chancey testified further that some three months later, in March 1992, Guerero called and said that he had been contacted by Bradfield about doing a deal with Chancey.  According to Chancey, he immediately notified personnel at a Texas district attorney's office, and together they began to develop a plan to lure Bradfield to Texas to purchase drugs.  The district attorney's office agreed to compensate Chancey with 15-25% of whatever money might ultimately be obtained in the drug deal.  When the district attorney realized that his office did not have the manpower or the

jurisdiction to carry out the plan, he called it off. Disappointed that he would not make any money, Chancey next contacted FBI personnel and persuaded them to take the case on the same contingency fee arrangement. Chancey admitted at trial that if he had not persisted with the FBI, the reverse-sting operation would have died when the district attorney in Texas lost interest.

Following several telephone conversations, some of which were taped, Bradfield and Chancey twice attempted — unsuccessfully — to structure the drug deal in Mississippi. Several weeks later, Chancey returned to Jackson, Mississippi and, in a taped telephone conversation on June 22, 1992, agreed to sell Bradfield four kilograms of cocaine for $50,000. They decided to meet at the Shoney's restaurant adjacent to the Shoney's Inn on East County Line Road where Chancey was staying.

That same day Williams, who is a mechanic, used auto parts dealer, and occasional roofing contractor from Yazoo County, Mississippi, agreed to ride to Jackson with his nephew, Herbert Watts, Jr., to pick up some furniture for delivery to Williams' sister-in-law, Joyce Sawyer, in Ridgeland, Mississippi. According to Watts' testimony, Williams and Watts rode in Watts' truck to East County Line Road and stopped at a convenience store to call Ms. Sawyer before picking up the furniture. She was not at home, so they decided to eat at the Shoney's restaurant next door.

Williams and Watts entered the restaurant with a relative of Roy Bradfield's, Newton "Shawn" Bradfield (Shawn), whom Williams had recognized in the parking lot. Once inside, Williams spotted

3

his old high school classmates, Bradfield and co-defendant Gregory Robertson, sitting together at a table. Williams, Watts, and Shawn joined Bradfield and Robertson and ordered something to eat.

Around 1:00 p.m., Chancey entered the restaurant and sat at a table next to the aforenamed group of five. Shortly after Chancey sat down, Bradfield pointed to Williams, indicating to Chancey that Williams was "the man that was going to bring the money," and then motioned for Chancey to accompany him (Bradfield) to the men's room. Inside the men's room, Bradfield and Chancey engaged in a lengthy conversation which Chancey was secretly recording. About fifteen minutes later, Williams entered the men's room, and Bradfield introduced him by his nickname, Chimp, to Chancey. The conversation resumed, this time among the three men.

The gist of this recorded conversation was that some of the drug money was at the restaurant, but that a substantial amount was elsewhere. Bradfield said that he and Robertson would leave the restaurant, presumably to retrieve the rest of the money, and instructed Williams to tell Shawn that they (Williams and Shawn) would show Chancey the money that Shawn was holding. Bradfield also instructed Williams to accompany Chancey to his motel room and wait there with him until Bradfield returned with the rest of the money. Williams agreed to go with Chancey, saying that he would take along a "notebook or something."

Instead of going with Chancey, though, Williams went back to the table and got Watts. The two of them then left the restaurant together, leaving Robertson and Shawn at the table.

David Langlois, an FBI electronics technician, witnessed the next series of events, to which he testified at trial. Langlois was driving home from work and stopped at a Texaco station at Exit 108 on I-55. While stopped, he saw a dark Buick Regal, which matched a vehicle description that he had heard earlier on the FBI radio, turn into the service station across the street from the Texaco and stop alongside a silver Ford Ranger pickup belonging to Watts. One of the occupants of the Buick (Langlois testified that there were at least two) entered the service station's convenience store, and the silver pickup was driven around to the rear of the store. The individual from the Buick left the store and walked around to the silver pickup at the rear of the store. Two individuals in the Buick then drove it away. The driver of the silver pickup moved it to the east side of the station, parked it, got out, and got into a dark colored, full-sized pickup truck belonging to Robertson, who had just arrived at the service station. The individual from the silver pickup and Robertson then left the station in Robertson's truck.

Langlois never saw gasoline purchased for any of the vehicles that had stopped at the station. The FBI agents who observed the scene (Langlois and his relief) reported that the individuals in the various vehicles appeared to be engaged in "counter-surveillance" activity, i.e., looking for indications of any suspicious circumstances or the presence of law enforcement officers.

Not surprisingly, Williams' brief recounts a significantly

different version of these events.  According to Williams' version, he and Watts left the restaurant and called Ms. Sawyer again, but she was still not home, so they drove to Williams' brother's house in Jackson.  Williams read the paper and dozed for about an hour while Watts continued the efforts to contact Ms. Sawyer.  Never able to reach her, the two headed back to Yazoo County, as Watts had to report to work in Canton, Mississippi at 3:30 p.m.  Watts stopped at a Texaco station at Exit 108 on I-55 and filled his truck with gasoline. Leaving the station, they saw Robertson putting diesel fuel into his truck.  Watts stopped beside Robertson's truck, and Williams asked Robertson if he wanted to see a roof that Williams had put on a "mansion" in Madison County. Watts parked his truck; Watts and Williams got into Robertson's truck; and the three went to see the roof (despite Watts' purported appointment in Canton).  Later, when those three returned to the Texaco station in Robertson's truck, three cars of FBI and DEA agents pulled in behind them, detained them for approximately 25-30 minutes, photographed them, and searched their persons as well as Robertson's and Watts' trucks, but eventually released all three without arresting them.

It is noteworthy that (1) Williams maintains that these events took place at the Texaco station at Exit 108 on I-55, but Langlois testified that they occurred at the service station across the street from the Texaco station, and (2) Langlois never saw fuel purchased for any of the vehicles.

Sometime after the vehicles left the service station,

6

Bradfield went to Chancey's room at the Shoney's Inn where, during a video taped meeting, Bradfield chided Chancey for not coming to Exit 108 so that the transaction could proceed more smoothly. Chancey and Bradfield went downstairs and got into the Buick. Inside the car, co-defendant Michael Roberts showed Chancey one sack of money, and Bradfield pointed to another sack of money on the floorboard. Chancey returned to his room alone, supposedly to get the drugs, whereupon Bradfield and Roberts were arrested in the Buick in possession of a 9mm machine pistol and $50,000.

Back at Exit 108, another FBI agent had observed Robertson drive into the same service station. Williams was in the truck with Robertson, who stopped beside Watts' silver pickup. Watts got out of his truck and into Robertson's. As Robertson drove off with Williams and Watts, two FBI agents stopped Robertson's truck, identified the three individuals, photographed them, and — according to Williams' brief — searched their persons and the two trucks but released them without arrest. No money or drugs were found on any of their persons or in their vehicles.

Bradfield was indicted by a federal grand jury, charged with conspiracy to possess with intent to distribute cocaine.[1] He did not testify at trial but relied primarily on an entrapment defense. The district court nevertheless refused to instruct the jury on entrapment. Bradfield was convicted and sentenced to 135 months, to be followed by a four year period of supervised release, and was

---

[1]Roberts and Robertson were also indicted and tried with Bradfield and Williams.

ordered to pay a $1,000 fine.

Bradfield timely appealed, asserting that the district court erred in: (1) failing to instruct the jury on entrapment, (2) failing to instruct the jury on evaluating the credibility of a compensated witness, and (3) denying a downward adjustment to Bradfield's sentence for acceptance of responsibility.

Williams was indicted by a federal grand jury, charged with conspiracy to possess with intent to distribute cocaine. Williams did not testify at trial but relied primarily on a defense of innocent presence and association. He was convicted and sentenced to 97 months, to be followed by a four year period of supervised probation, and was ordered to pay a fine of $1,000. Williams filed motions for a judgment of acquittal and a new trial, both of which were denied by the district court.

Williams timely appealed, asserting that (1) the evidence was insufficient to support his conviction, (2) the district court erroneously denied his motion for a new trial, (3) the district court denied his right to a speedy trial, (4) the district court's rulings were inconsistent, and (5) his counsel was ineffective.

## II.

### ANALYSIS

A. BRADFIELD

*1. Jury instruction on entrapment*

A defendant is entitled to an entrapment instruction when there is sufficient evidence from which a reasonable jury could

**8**

find entrapment.[2]  It follows that when a defendant's properly requested entrapment instruction is undergirded by evidence sufficient to support a reasonable jury's finding of entrapment, the district court errs reversibly by not adequately charging the jury on the theory of entrapment.[3]

The critical determination in an entrapment defense is whether criminal intent originated with the defendant or with the government agents.[4]  Thus the threshold question is whether the defendant was predisposed to commit the offense.[5]  To assert an entrapment defense successfully, the defendant must first make out a prima facie case that the government's conduct created a

---

[2]Matthews v. United States, 485 U.S. 58, 62, 108 S. Ct. 883, 886 (1988); United States v. Collins, 972 F.2d 1385, 1413 (5th Cir. 1992), cert. denied, 507 U.S. 1017, 113 S. Ct. 1812 (1993). See also United States v. Branch, 91 F.3d 699, 711-12 (5th Cir. 1996)("As a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor . . . .")(citing Matthews, 485 U.S. at 63, 108 S. Ct. at 887).

[3]See United States v. Schmick, 904 F.2d 936, 943 (5th Cir. 1990), cert. denied sub nom., 498 U.S. 1067, 111 S. Ct. 782 (1991)("It has long been well established in this Circuit that it is reversible error to refuse a charge on a defense theory for which there is an evidentiary foundation and which, if believed by the jury, would be legally sufficient to render the accused innocent.")(quoting United States v. Lewis, 592 F.2d 1282, 1285 (5th Cir. 1979)); United States v. Johnson, 872 F.2d 612, 622 (5th Cir. 1989)("When a defendant properly requests an instruction on a theory of defense that is supported by some evidence, it is reversible error not to adequately present the theory.").

[4]United States v. Pruneda-Gonzalez, 953 F.2d 190, 197 (5th Cir.), cert. denied, 504 U.S. 978, 112 S. Ct. 2952 (1992)(citing United States v. Nations, 764 F.2d 1073, 1079 (5th Cir. 1985)); United States v. Toro, 840 F.2d 1221, 1230 (5th Cir. 1988).

[5]United States v. Ivey, 949 F.2d 759, 768 (5th Cir. 1991), cert. denied sub nom., 506 U.S. 819, 113 S. Ct. 64 (1992).

**9**

substantial risk that an offense would be committed by a person other than one ready to commit it.[6]  This requires the defendant to show both (1) his lack of predisposition to commit the offense and (2) some governmental involvement and inducement more substantial than simply providing an opportunity or facilities to commit the offense.[7]

Before our decision in United States v. Nations,[8] it was unclear how much evidence of non-predisposition and inducement the defendant had to show before he becomes entitled to an entrapment instruction.[9]  One line of decisions directed the trial judge to give an entrapment instruction if the defendant presented any evidence supporting his assertions, regardless of how flimsy or insubstantial his evidence might be.[10]  An alternative view required the defendant to present substantial evidence, which was defined as more than just a smattering or a scintilla, before he could obtain an entrapment instruction.[11]

---

[6]Johnson, 872 F.2d at 620; United States v. Hudson, 982 F.2d 160, 162 (5th Cir.), cert. denied, 510 U.S. 831, 114 S. Ct. 100 (1993)

[7]Pruneda-Gonzalez, 953 F.2d at 197; United States v. Andrew, 666 F.2d 915, 922 (5th Cir. 1982); United States v. Leon, 679 F.2d 534, 538 (5th Cir. 1982); United States v. Fischel, 686 F.2d 1082, 1085 (5th Cir. 1982).

[8]764 F.2d 1073 (5th Cir. 1985).

[9]Nations, 764 F.2d at 1080; Fischel, 686 F.2d at 1086 n.2.

[10]See Perez v. United States, 297 F.2d 12 (5th Cir. 1961).

[11]See Pierce v. United States, 414 F.2d 163 (5th Cir.), cert. denied, 396 U.S. 960, 90 S. Ct. 435 (1969).

**10**

In Nations, we resolved these conflicting authorities, stating that the defendant must show evidence that provides, at the least, a basis for a reasonable doubt on the ultimate issue of whether criminal intent originated with the government. In short, the record must contain sufficient evidence of both inducement and lack of predisposition to raise an entrapment issue; the entrapment issue need not be presented to the jury if the evidence does not raise the issue to that degree.[12]

The Supreme Court's holding in Matthews — that a defendant is entitled to an entrapment instruction when there is sufficient evidence from which a reasonable jury could find entrapment — comports with our pronouncement in Nations. Moreover, in the recent decision of United States v. Branch,[13] we rejected the scintilla of evidence standard, recognized that Matthews resolved the issue of the amount of evidence required, and reiterated the standard — that evidence in support of a defensive theory must be sufficient for a reasonable jury to rule in favor of the defendant on that theory.[14]

Predisposition focuses on whether the defendant was an "unwary innocent" or, instead, an "unwary criminal" who readily availed himself of the opportunity to perpetrate the offense.[15]

---

[12]Nations, 764 F.2d at 1080.

[13]91 F.3d 699, 712-13 (5th Cir. 1996).

[14]See also United States v. Stowell, 953 F.2d 188, 189 (5th Cir.), cert. denied, 503 U.S. 908, 112 S. Ct. 1269 (1992).

[15]Matthews, 485 U.S. at 63, 108 S. Ct. at 886 (citations omitted).

Specifically, the question is whether the defendant intended, was predisposed, or was willing to commit the offense before first being approached by government agents.[16] Government inducement consists of the creative activity of law enforcement officials in spurring an individual to crime.[17] It need not overpower the defendant's will. Neither does the entrapment defense require proof of threats or coercion.[18]

If the defendant makes a prima facie showing of both elements — lack of predisposition and true inducement by the government — he is entitled to a jury instruction on the issue of entrapment.[19] At this juncture the burden shifts to the government to prove beyond a reasonable doubt that the defendant was disposed to commit the offense prior to first being approached by government agents.[20] But evidence that government agents merely afforded the defendant an opportunity or the facilities for the commission of the crime is insufficient to warrant the entrapment instruction.[21]

Bradfield insists that the strong preponderance of the

---

[16]Johnson, 872 F.2d at 620-21 (citing United States v. Yater, 756 F.2d 1058 (5th Cir.), cert. denied, 474 U.S. 901, 106 S. Ct. 225 (1985)).

[17]Fischel, 686 F.2d at 1085.

[18]Id.

[19]United States v. Hudson, 982 F.2d 160, 162 (5th Cir.), cert. denied, 510 U.S. 831, 114 S. Ct. 100 (1993); Fischel, 686 F.2d at 1085; Leon, 679 F.2d at 538; Andrew, 666 F.2d at 922-23.

[20]Hudson, 982 F.2d at 162.

[21]Matthews v. United States, 485 U.S. 58, 66, 108 S. Ct. 883, 888 (1988).

evidence adduced at trial demonstrates beyond serious question that the government, through Chancey's overly persistent efforts, induced Bradfield to commit an offense that he was not predisposed to commit, i.e., that the sheer number of contacts initiated by Chancey without response or encouragement from Bradfield before Bradfield finally succumbed to Chancey's ceaseless siren song demonstrates both absence of predisposition and substantial governmental coaxing. Thus, he argues, the district court erred in refusing to instruct the jury on entrapment. Bradfield emphasizes the following: (1) He met Chancey purely by coincidence on a trucking job and passively listened in on a conversation between Chancey and Guerero about guns and drugs; (2) Bradfield and Chancey did not plan a drug deal on the day that they met, and Bradfield left without attempting to get Chancey's phone number; (3) Chancey testified that the reverse-sting was his idea from the beginning and that only his initiative and persistence with the FBI kept the plan alive; (4) Chancey had a substantial contingency fee arrangement with the FBI, and he owed approximately $1,500 in child support; (5) Chancey admitted at trial that it was he who called Bradfield and told him to contact Guerero if he wanted to do a deal, not vice versa (and even then admitted subsequently that he had not talked to Bradfield but only to Bradfield's wife); and (6) Chancey bombarded Bradfield into submission with approximately eighteen calls during April 1992, in an unrelenting campaign to entice Bradfield to do a drug deal, before he finally succumbed and started to negotiate.

Predictably, the government counters that the evidence adduced at trial showed Bradfield's predisposition to commit the offense, thereby obviating the necessity for an entrapment instruction. First, the conversation between Bradfield, Chancey, and Guerero during the trucking job regarding the trading of guns for cocaine demonstrated that Bradfield was a willing participant even before Chancey became a government informant. And it was Chancey who told Bradfield that he (Chancey) would not do a drug deal until the trucking job was completed.[22] Second, Chancey testified that Guerero had called him and said that Bradfield had contacted Guerero about doing a deal with Chancey.[23] Third, the numerous recorded phone calls between Bradfield and Chancey revealed Bradfield's willingness to commit the offense. Finally, in a recorded face-to-face conversation, Bradfield confided in Chancey that he (Bradfield) was going to tell his friends who were supplying the drug money that their price was $15,000 per kilo when in actuality the price was $12,000 per kilo.

The government's protestations to the contrary notwithstanding, we conclude that Bradfield made a prima facie showing of non-predisposition and inducement, with sufficient evidence, under Matthews, upon which a reasonable jury could base

---

[22]As noted earlier, it is unclear from Chancey's testimony whether (1) Bradfield actually participated in this conversation or merely listened in, and (2) Bradfield attempted to arrange a drug deal with Chancey that day or Chancey gratuitously offered his future participation.

[23]The trial judge admitted this double hearsay testimony over an objection by Bradfield's attorney, but the admissibility of this testimony is not specifically challenged on appeal.

a finding that Bradfield was entrapped.  First, there is sufficient evidence that Bradfield was not disposed to commit the offense. The record is devoid of evidence that Bradfield had ever shown an interest or willingness to participate in a drug deal before he met Chancey.  And he continued to exhibit an absence of intent for quite a while, despite Chancey's persistent overtures.  Second, the record contains a plethora of evidence of government inducement.[24] The reverse-sting operation was Chancey's idea, and he actively solicited the FBI's involvement in the plan.  It was only through his self-interested, persistent, and relentless efforts that Chancey was finally able to persuade Bradfield to participate in the drug deal.  Furthermore, Chancey was driven, to the point of obsession, by the prospect of substantial monetary reward from his contingency fee agreement and was clearly motivated by his pressing financial obligations.

As the evidence was more than sufficient to establish a prima

---

[24]As neither side introduced into evidence either the tapes or transcripts of the numerous recorded "courtship" calls that Chancey admittedly made to Bradfield before he finally decided to participate in the deal, we must infer that the content of those calls could neither have helped nor harmed either the government's case or Bradfield's.  As it is obvious from the rest of the record evidence, however, that Chancey repeatedly tried to tempt Bradfield before he finally accepted Chancey's invitation to deal, the only appropriate inference is that Bradfield rejected (or at least never responded affirmatively to) the myriad entreaties from Chancey which preceded Bradfield's eventual acceptance.  It follows that there is sufficient evidence and inferences of government inducement to mandate the entrapment instruction.  This same evidence distinguishes the instant case from United States v. Fischel, 868 F.2d 1082, 1086 (5th Cir. 1982), in which we found no error in the district court's refusal to instruct the jury on entrapment when the defendant had made but a single hesitation of acquiescence ("I can't get involved in this.") before he agreed to and did participate in the drug transaction.

**15**

facie showing of both Bradfield's lack of predisposition before first governmental contact and the government's protracted inducement efforts, we cannot avoid the conclusion that the district court's refusal to instruct the jury on entrapment constituted reversible error.  As we are also convinced that but for this error there is a substantial likelihood that the jury verdict might have been favorable to Bradfield, we do not engage in testing for harmlessness.  To do so under these circumstances would be a hollow act.

*2. Jury instruction on compensated witnesses*

Bradfield also contends that the district court committed reversible error when it failed to instruct the jury specifically on evaluating the credibility of a government informant witness who is compensated pursuant to a contingency fee agreement.  As Bradfield raises this claim for the first time on appeal, we review it for plain error.[25]

We have previously adopted a specific instruction for use in this circuit regarding a paid informant's testimony, and it provides in pertinent part:

> The testimony of . . . one who provides evidence against a defendant as an informer for pay . . . must always be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses.  You, the jury, must decide whether the witness's testimony has been affected by any of those circumstances, or by the witness's interest in the outcome of the case, or by prejudice against the defendant, or by the benefits that the witness has received . . . financially . . . .  You should keep in mind that such testimony is always to be

---

[25]United States v. Lopez, 923 F.2d 47, 49 (5th Cir.), cert. denied, 500 U.S. 924, 111 S. Ct. 2032 (1991).

**16**

received with caution and weighed with great care.[26]

The district court did not give this instruction but charged the jury instead with a general instruction on the credibility of witnesses, which provides in pertinent part:

> [A]sk yourself a few questions: Did the person impress you as honest?  Did the witness have any particular reason not to tell the truth?  Did the witness have a personal interest in the outcome of the case?  Did the witness have any relationship with either the government or the defense?[27]

The government contends that the district court adequately charged the jury, as the instruction given included language similar to that found in the specific paid informant instruction. We disagree: The district court should have given the specific paid informant instruction, even if it had to do so on its own motion. Moreover, its failure to do so was plain error.

Until 1987, we had a longstanding, per se rule that an informant who was paid a contingency fee was not competent to testify.[28]  By that time, however, we had virtually eliminated the per se rule — except in the situation where the informant's fee was contingent on the conviction of a pretargeted individual — by

---

[26]Pattern Jury Instructions (Criminal Cases) for the U.S. Fifth Circuit, 1990 Edition, General and Preliminary Instruction 1.15, "Accomplice-Informer-Immunity" at 26.

[27]Id. at 20.

[28]Williamson v. United States, 311 F.2d 441 (5th Cir. 1962), cert. denied, 381 U.S. 950, 85 S. Ct. 1803 (1965).  In Williamson, the government, attempting to infiltrate a bootlegging operation, paid its informant $10 per day in expenses and promised him $200 if he could "catch" Williamson and another $100 for Lowrey.

carving out numerous exceptions to and distinctions of that rule.[29] Then, sitting en banc in United States v. Cervantes-Pacheco,[30] we abolished the per se rule and held that an informant who is promised a contingency fee by the government is not automatically disqualified from testifying in a federal criminal trial; rather it is for the jury to evaluate the credibility of the witness's testimony in light of, inter alia, the fee arrangement.[31]

---

[29]See United States v. Garcia, 528 F.2d 580, 587 (5th Cir.), cert. denied sub nom., 426 U.S. 952, 96 S. Ct. 3177 (1976)(fee must be contingent on the conviction of a pretargeted individual; Williamson does not apply where an informant is paid a subsistence allowance and given a reward, as long as there is no evidence that he had been promised a specific sum to convict a particular person); Harris v. United States, 400 F.2d 264, 266 (5th Cir. 1968)(Williamson does not apply if the government knows that the targeted individual was engaged in the illicit activity prior to the institution of the contingent fee arrangement); and Henley v. United States, 406 F.2d 705, 706 (5th Cir. 1969)(refusing to reverse a conviction when the informant's testimony is fully corroborated at trial).  At the time, it was unclear whether Williamson only prohibited the government from agreeing to pay a fee contingent on a conviction or whether it also prohibited the government from paying a fee contingent on implication of a suspect or some other governmental objective short of conviction.  Compare United States v. Lane, 693 F.2d 385, 387 (5th Cir. 1982)(applying Williamson to fees contingent on implication) with United States v. Gray, 626 F.2d 494, 499 (5th Cir.), cert. denied sub nom., 449 U.S. 1038, 101 S. Ct. 616 (1980)(applying Williamson to fees contingent on conviction).

[30]United States v. Cervantes-Pacheco, 826 F.2d 310, 315 (5th Cir. 1987), cert. denied sub nom., 484 U.S. 1026, 108 S. Ct. 749 (1988).

[31]The need to treat witnesses who are compensated for their testimony consistently with witnesses who are promised a reduced sentence in exchange for their testimony, the latter being a practice thoroughly ingrained in our criminal justice system, persuaded us to abolish the per se rule.  These two categories of witnesses are indistinguishable in principle, and both should be allowed to testify subject to the jury's evaluation of the credibility of their testimony.  See Cervantes-Pacheco, 826 F.2d at 315.

In Cervantes-Pacheco, the government had routinely paid its informant (1) a per diem, (2) his expenses, and (3) an amount at the conclusion of each case based on the government's evaluation of the informant's overall performance.  The informant testified that he could not predict from fees previously earned the amount of his fee in the case at bar and that his fee did not depend on the ultimate outcome of the case or on the arrest or conviction of any defendant.[32]  Under these facts, which are clearly distinguishable from those in Williamson, we not only eliminated the per se rule which had barred the testimony of a witness who is promised a contingency fee for the conviction of a pretargeted individual.  We also expanded the pool of competent witnesses to include all witnesses who are compensated for their testimony, whether by a contingency fee, a sentence reduction, or some other quid pro quo. We reasoned that the structural protections inherent in cross-examination and in the jury's evaluation of the witness's credibility  provide a check on such testimony.  As the Supreme Court stated in Hoffa v. United States:[33]

> The established safeguards of the Anglo-American legal system leave the veracity of a witness to be tested by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury.

In mitigation of the result of our lifting the per se bar,

---

[32]Cervantes-Pacheco, 826 F.2d at 311-12.

[33]385 U.S. 293, 311, 87 S. Ct. 408, 418 (1966).  In Hoffa, the government, in exchange for the informant's testimony, dropped or failed to actively pursue state and federal charges against the informant and paid his wife four monthly installments of $300 each from government funds.

however, we imposed four restrictions on the admissibility of such testimony.[34]  So long as these rules — which are designed to protect against abuses — are not violated, it remains for the jury to evaluate the credibility of the compensated witness.[35]

Our intention was for the admissibility of the testimony of a compensated witness to be conditioned on compliance with these rules, one of which calls upon the district court to instruct the jury specifically on the suspect credibility of a compensated witness.  Even though the rule is expressed in non-mandatory terms, we explicitly held in <u>Cervantes-Pacheco</u> that "the credibility of the compensated witness . . . is for a *properly instructed* jury to determine."[36]  The Supreme Court in <u>Hoffa</u> agreed that the jury must be properly instructed to perform its function adequately.[37]  And, in subsequent cases we have required the specific instruction as a

---

[34]First, the government must not deliberately use perjured testimony or encourage the use of perjured testimony.  Second, the government must make a complete and timely disclosure to the accused of the fee arrangement that it has made with the informant.  Third, the accused must have an adequate opportunity to cross-examine the informant and government agents about any agreement to compensate the witness. *Finally, the trial court should give a careful instruction to the jury pointing out the suspect credibility of a fact witness who has been compensated for his testimony.*  See <u>Cervantes-Pacheco</u>, 826 F.2d at 315-16 (citations omitted)(emphasis added).

[35]<u>United States v. Rizk</u>, 833 F.2d 523, 525 (5th Cir. 1987), <u>cert. denied</u>, 488 U.S. 832, 109 S. Ct. 90 (1988)(citing <u>Cervantes-Pacheco</u>, 826 F.2d at 315-16).

[36]<u>Cervantes-Pacheco</u>, 826 F.2d at 316 (emphasis added).

[37]<u>Hoffa</u>, 385 U.S. at 311, 87 S. Ct. at 418.

prerequisite to the admissibility of such testimony.[38]

As noted, we have set forth with precision the rules that govern the admissibility of the testimony of a compensated witness. Under the instant circumstances we are constrained to conclude that the district court plainly erred in failing to give the jury the specific instruction on evaluating the credibility of a compensated witness. Ordinarily, though, our inquiry does not stop at a determination of error; once we have found it, we test it for harmlessness. We need not reach the question of harmlessness today, however, for we have already found reversible error constituting harm in the district court's refusal to instruct the jury on entrapment. Even if that alone were not sufficient, the cumulative effect of these two errors would certainly require reversal of Bradfield's conviction.

A final point must be made in connection with jury instructions and compensated witnesses. The district court was required to give the appropriate compensated witness instruction on its own. Moreover, when the government exercises its privilege of introducing the testimony of a compensated witness, it is obligated to ensure compliance with the rules governing the admissibility of

---

[38]United States v. Goff, 847 F.2d 149, 161 (5th Cir.), cert. denied sub nom., 484 U.S. 1026, 108 S. Ct. 749 (1988)("[T]he trial court must give the jury careful instructions pointing out the suspect credibility of a fact witness who has been or expects to be compensated for his testimony.")(emphasis added); Rizk, 833 F.2d at 525("The testimony of an informant to whom the government has promised a fee is admissible if . . . the trial court, in instructing the jury, has pointed out the suspect credibility of a fact witness who has been compensated for his testimony.")(citation omitted)(emphasis added).

such testimony — including the giving of the <u>Cervantes-Pacheco</u> instruction.  If, as here, the court fails to do so on its own and the defendant fails to request such an instruction, the government must.  As an officer of the court, the prosecutor should have fulfilled the government's obligation by inviting the district court to give the specific <u>Cervantes-Pacheco</u> instruction on evaluating the credibility of a compensated witness.  Henceforth this holding must be implemented by the trial courts of this circuit, and they must be assisted by government prosecutors in such implementation when and if a reminder should be necessary.

*3. Acceptance of responsibility*

The district court denied a downward adjustment to Bradfield's sentence for acceptance of responsibility under U.S.S.G. §3E1.1. As we are reversing his conviction and vacating his sentence, we need not and therefore do not address Bradfield's assignment of error on this point.  He remains free to re-urge his acceptance of responsibility if he should be convicted in the future — by guilty plea or by the jury — on the charges he faced here, or any of them.

B. WILLIAMS

*1. Sufficiency of the evidence; Motion for new trial*

In reviewing challenges to the sufficiency of the evidence, we consider the evidence in the light most favorable to the verdict and decide whether a rational jury could have found that the government proved all of the elements of the offense beyond a

reasonable doubt.[39]  We resolve all inferences and credibility determinations in favor of the jury's verdict.[40]

To sustain a conviction for conspiracy to possess with the intent to distribute cocaine, the government must prove beyond a reasonable doubt that (1) a conspiracy existed, (2) the defendant knew of the conspiracy, and (3) the defendant voluntarily participated in the conspiracy.[41]  The government need not prove the elements by direct evidence alone; their existence may be inferred from the "development and collocation of circumstances."[42]

That one's mere presence at the crime scene or close association with the conspirators, standing alone, will not support an inference of participation in the conspiracy is long and well established.[43]  We will not lightly infer a defendant's knowledge of and participation in a conspiracy,[44] and the government may not

---

[39]United States v. Maltos, 985 F.2d 743, 746 (5th Cir. 1992)(citing Glasser v. United States, 315 U.S. 60, 80, 62 S. Ct. 457, 469 (1942)); United States v. Castro, 15 F.3d 417, 419 (5th Cir.), cert. denied sub nom., ___ U.S. ___, 115 S. Ct. 127 (1994).

[40]Castro, 15 F.3d at 419.

[41]Maltos, 985 F.2d at 746; United States v. Sacerio, 952 F.2d 860, 863 (5th Cir. 1992).

[42]Maltos, 985 F.2d at 746 (quoting United States v. Vergara, 687 F.2d 57, 61 (5th Cir. 1982), cert. denied, 484 U.S. 957, 108 S. Ct. 354 (1987)).

[43]Maltos, 985 F.2d at 746; United States v. DeSimone, 660 F.2d 532, 537 (5th Cir. 1981), cert. denied sub nom., 455 U.S. 1027, 102 S. Ct. 1732 (1982); Sacerio, 952 F.2d at 863; United States v. Espinoza-Seanez, 862 F.2d 526, 537 (5th Cir. 1988); United States v. Jackson, 700 F.2d 181, 185-86 (5th Cir.), cert. denied sub nom., 464 U.S. 842, 104 S. Ct. 139 (1983).

[44]Maltos, 985 F.2d at 747 (citing Jackson, 700 F.2d at 185).

**23**

prove a conspiracy merely by presenting evidence that places the defendant in "a climate of activity that reeks of something foul."[45]

Williams claims that the evidence is insufficient to support his conviction, insisting that it does nothing more than establish his presence at the crime scene and his association with others who were participating in the illegal activity.[46] Specifically, Williams maintains that the government's evidence shows only that he (1) was seen at the Shoney's restaurant with Bradfield, Robertson, Watts, and Shawn, (2) participated in a portion of the recorded conversation in the men's room with Bradfield and Chancey, and (3) together with Watts and Robertson, was detained at the service station, searched, and released without arrest.

Our review of the record leads us to conclude that the evidence adduced at trial and all reasonable inferences therefrom are sufficient, when viewed in the light most favorable to the verdict, to show beyond a reasonable doubt that Williams knew of and participated in the conspiracy. First, Chancey testified that, before going into the men's room, Bradfield pointed to Williams, indicating that he was the man who would bring the money. Second, Williams did not merely listen but participated at length in the recorded conversation in the men's room during which he, Chancey, and Bradfield discussed the exchange of the money for the cocaine.

---

[45]Maltos, 985 F.2d at 747 (citing United States v. Galvan, 693 F.2d 417, 419 (5th Cir. 1982)).

[46]Williams does not dispute that a conspiracy existed — only that the evidence was insufficient to show beyond a reasonable doubt that he (1) knew of and (2) participated in the conspiracy.

On this point, we have previously recognized that the knowledge and participation required for a conspiracy conviction may be inferred from evidence that the defendant was present during or participated in one or more pertinent conversations with others who were parties to a conspiracy.[47] Both the temporal and substantive extent of Williams' participation in the men's room conversation indicates that his involvement was more substantial than mere presence or association. Finally, in the men's room conversation, Williams agreed to go to the motel with Chancey and wait for Bradfield to return with the rest of the money.

Viewed in the light most favorable to the jury's verdict, the evidence is sufficient to sustain Williams' conviction. It follows that the district court did not abuse its discretion in denying Williams' new trial motion grounded on an insufficiency of the evidence.[48]

*2. Speedy trial*

Williams maintains that the district court denied his right to a speedy trial. Whether a district court has complied with the

---

[47]See Jackson, 700 F.2d at 185 ("The government has offered no evidence indicating that [the defendant] was present during conversations in which the conspiracy was discussed.")(footnote omitted); Espinoza-Seanez, 862 F.2d at 538 ("[Defendant] was shown to have been with the conspirators in a car which they drove while making arrangements furthering their drug trafficking, but he was never shown to have heard any of the conversations or participated in any of them.")(referring to United States v. Gardea-Carrasco, 830 F.2d 41 (5th Cir. 1987)).

[48]United States v. Webster, 960 F.2d 1301, 1305 (5th Cir.), cert. denied sub nom., 506 U.S. 927, 113 S. Ct. 355 (1992)(reviewing district court's denial of a motion for a new trial for clear abuse of discretion).

Speedy Trial Act is a matter of law subject to our de novo review.[49] The Act requires that a defendant be tried within seventy non-excludable days of indictment; otherwise, the indictment shall be dismissed on motion of the defendant.[50] Nevertheless, the defendant's failure to move for dismissal prior to trial or entry of a plea of guilty or nolo contendre constitutes a waiver of the right to dismissal.[51] When Williams failed to raise the alleged error prior to trial, he waived his right to dismissal under the Speedy Trial Act.

### 3. Inconsistent rulings by the district court

Williams posits that co-defendants to a conspiracy indictment must be treated alike;[52] consequently, he insists, the district court erred in denying his motion for a new trial after that court granted such a motion by Robertson. But Williams is wrong in his basic premise: Our precedent does not require identical treatment of co-defendants to a conspiracy indictment. It follows that Williams' claim is without merit.

---

[49]United States v. Jackson, 30 F.3d 572, 575 n.2 (5th Cir. 1994)(citing United States v. Taylor, 487 U.S. 326, 108 S. Ct. 2413 (1988)).

[50]18 U.S.C. § 3161(c)(1) (1994).

[51]18 U.S.C. § 3162(a)(2) (1994).

[52]Williams' argument misinterprets United States v. Sheikh, 654 F.2d 1057 (5th Cir. 1981), cert. denied, 455 U.S. 991, 102 S. Ct. 1617 (1982), and United States v. Zuniga-Salinas, 945 F.2d 1302 (5th Cir. 1991), both of which have been subsequently overruled and reversed, respectively, by United States v. Zuniga-Salinas, 952 F.2d 876 (5th Cir. 1992)(en banc)(holding that an inconsistent verdict is not a bar to conviction where all other co-conspirators are acquitted).

## 4. *Ineffective assistance of counsel*

Finally, Williams contends that his counsel was ineffective in (1) waiving Williams' speedy trial rights without his consent, (2) subjecting Williams to public ridicule, scorn, and suspicion in his hometown as a result of his delayed detention, (3) failing to object timely to testimony implicating Williams in prior narcotics deals, and (4) conceding Williams' guilt in closing argument. Generally we shall not address a claim of ineffective assistance of counsel on direct appeal unless it has been raised before the district court. By way of exception, though, we shall review an ineffective assistance claim that was not previously raised to the district court if the record is sufficiently developed with respect to the merits of such a claim.[53] As Williams' claim was neither raised in the district court nor sufficiently developed in the record, we decline to address this alleged error on direct appeal.

### III.

### CONCLUSION

As the district court erred reversibly in refusing to instruct the jury on entrapment, and also erred in not giving the jury the paid informant instruction, we reverse Bradfield's conviction, vacate his sentence, and remand his case for a new trial. Failure to give the entrapment instruction is alone sufficient to entitle Bradfield to a new trial; coupled with the failure to give the compensated witness instruction, these two errors mandate the

---

[53]United States v. Tolliver, 61 F.3d 1189, 1222 (5th Cir. 1995)(citing United States v. McCaskey, 9 F.3d 368, 380 (5th Cir. 1993), cert. denied, ___ U.S. ___, 114 S. Ct. 1565 (1994)).

result that we reach today and no other.  When, during the course of the new trial, the district court addresses the matter of jury instructions, its rulings must comport with the holdings we make today.  For the foregoing reasons, the conviction of Williams is affirmed; but the conviction of Bradfield is reversed and remanded for a new trial, and accordingly his sentence is vacated. AFFIRMED as to Williams; REVERSED, VACATED, and REMANDED as to Bradfield.