IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 00-50578

_____


UNITED STATES OF AMERICA

                                        Plaintiff - Appellee

        v.

JESSICA COVARRUBIA

                                        Defendant - Appellant

_____

Appeal from the United States District Court
for the Western District of Texas
No. DR-99-CR-757-2
_____

July 24, 2001

Before KING, Chief Judge, BARKSDALE, Circuit Judge, and NOWLIN, District Judge.[*]

PER CURIAM:[**]

    Defendant-Appellant Jessica Covarrubia appeals her

conviction on one count of conspiracy to import marijuana,

_____

    [*]  Chief Judge of the Western District of Texas, sitting by designation.

    [**]  Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

challenging the sufficiency of the evidence. For the following reasons, we AFFIRM.

"We review the sufficiency of the evidence by examining all the evidence in the light most favorable to the verdict." United States v. Guerrero, 234 F.3d 259, 261-62 (5th Cir. 2000). "We will affirm if the evidence is such that a rational trier of fact could have found the requisite elements of the offense beyond a reasonable doubt." Id. at 262.

Covarrubia was convicted of conspiracy to import marijuana in violation of 21 U.S.C. §§ 952(a) and 960(a)(1), (b)(4). To prove a drug conspiracy, the Government must establish: (1) the existence of an agreement between two or more persons to violate federal narcotics laws (e.g., to import marijuana); (2) the defendant's knowledge of the agreement; and (3) the defendant's voluntary participation in the agreement. See United States v. Paul, 142 F.3d 836, 839-40 (5th Cir. 1998); United States v. Brito, 136 F.3d 397, 409 (5th Cir. 1998); United States v. Pofahl, 990 F.2d 1456, 1467-68 (5th Cir. 1993). These elements need not be proven by direct evidence. United States v. Maltos, 985 F.2d 743, 746 (5th Cir. 1992). The agreement and the defendant's knowledge and participation in the conspiracy may be inferred from the "development and collocation of circumstances." Id. (internal quotations and citation omitted). Although mere association or presence by themselves are insufficient to prove knowing participation in the agreement, see id.; United States v.

2

Vergara, 687 F.2d 57, 61 (5th Cir. 1982), when combined with other relevant circumstantial evidence, these factors may constitute sufficient evidence to support a conspiracy conviction.  See United States v. Williams-Hendricks, 805 F.2d 496, 503 (5th Cir. 1986).  Inconsistent statements and implausible explanations may constitute circumstantial evidence of a defendant's guilty knowledge.  See United States v. Cano-Guel, 167 F.3d 900, 905 (5th Cir. 1999); see also United States v. Ramos-Garcia, 184 F.3d 463, 466 (5th Cir. 1999).

A rational trier of fact could have found that the evidence established the existence of an agreement to import marijuana, Covarrubia's knowledge of that agreement, and her voluntary participation in that agreement.  On November 6, 1999, Covarrubia was a passenger in a 1993 Buick LeSabre driven by Alex Gallegos, which was stopped at the Eagle Pass Port of Entry in Texas.  Upon inspection, forty-seven pounds of marijuana were found concealed in the gas tank of the LeSabre.

When originally stopped at the Port of Entry, prior to the discovery of the marijuana, Gallegos and Covarrubia both stated that they had driven from San Antonio, Texas to Piedras Negras, Mexico that morning to do some shopping; that they had not purchased anything; and that they were headed back to San Antonio.  However, after the marijuana was discovered, United States Special Agent Enemencio Torres interviewed Covarrubia. During this interview, she stated that Gallegos had asked her to

3

go cruising with him that morning[1] and that she had agreed without knowing where they were going, but that they had eventually arrived in Piedras Negras. Regarding their visit to Mexico, Covarrubia claimed that they stayed in Mexico about fifteen to twenty minutes, during which time she never left the car. She stated further that, in Piedras Negras, Gallegos saw someone he recognized, that Gallegos stepped out of the car to speak to this individual, and that the conversation lasted for about ten minutes. Finally, she stated that when Gallegos got back into the car, they returned to Eagle Pass, intending to continue on to San Antonio. Based on Covarrubia's statements that she went to Piedras Negras to shop, but spent only fifteen minutes in the country, did not leave the car, and did not purchase anything, a jury could reasonably infer that her statements were inconsistent and implausible.

Furthermore, although Covarrubia stated that she never left the car while it was in Mexico, the inspectors noted that the straps which held in the gas tank were bolted to the car with very shiny bolts and that an eight-by-ten-inch rectangular trap door had been cut into the top of the gas tank. The trap door was covered with a black substance that, at the time of the inspection, was still "very moist [and] very sticky." Because it

---

[1] Additionally, an agriculture inspector testified that he saw Covarrubia at the Eagle Pass Port of Entry on November 5, 1999, the day before Covarrubia stated she left San Antonio.

4

is extremely unlikely that anyone would have driven a car loaded with forty-seven pounds of marijuana from San Antonio to Piedras Negras and back, a jury could reasonably infer that the marijuana had been placed in the car in Mexico.  In addition, because Covarrubia stated that she never left the car, it is reasonable to assume that she would have noticed the concerted activity involved in placing the marijuana in the gas tank.

Finally, in addition to the marijuana discovered in the LeSabre, the customs agents also discovered a license plate in the trunk of the car which did not belong to the LeSabre.  It, in fact, belonged to a 1992 Honda Prelude.  Notably, Covarrubia's husband, Arturo Sanchez,[2] was also seen by a customs inspector at the Eagle Pass Port of Entry on November 6, 1999, driving a 1992 Honda Prelude.  Furthermore, although no press releases regarding the seizure had been issued and no one outside the customs office had been informed that the seizure had occurred, Special Agent Torres received two phone calls from individuals inquiring about Covarrubia while Covarrubia was being detained, one claiming to be a female friend of Covarrubia and the other claiming to be Covarrubia's husband.  A jury could reasonably infer that this evidence further supported the existence of an importation

_____

[2]  We refer to Sanchez as Covarrubia's husband because he was referred to as such during the trial and in Covarrubia's statement; however, we note that the Presentence Investigation Report states that Covarrubia and Sanchez have never been legally married but have "been together" for five years and have one child together.

5

conspiracy and Covarrubia's knowledge of and voluntary participation in the conspiracy.

Covarrubia's conviction and sentence are AFFIRMED.